JOHN JOSEPH TOBIN v. ELIZA HAACK and Another.

February 7, 1900.

Nos. 11,817—(152).

| 79 | 101 |
|----|-----|
| 81 | 30 |
| d81 | 32 |

**Execution of Will.**

A last will and testament, not executed in conformity with the requirements of G. S. 1894, § 4426, is invalid.

**Same.**

A last will and testament must be signed by the testator in the presence of the subscribing witnesses, or, if not so signed, the testator must acknowledge to such witnesses that the signature thereto attached is his, or in some other way clearly and unequivocally indicate to them that the will about to be signed by them as witnesses is his last will, and has been signed by him.

**"Attest" in G. S. 1894, § 4426.**

To "attest" the execution of a will, within the meaning of G. S. 1894. § 4426, is to witness and observe the execution and signing thereof by the testator, or to be expressly and clearly informed by the testator, before signing as witness, that he has signed and executed it.

**Evidence.**

Evidence recited in the opinion *held* sufficient to justify a finding by the trial court that the will in question was not executed as required by statute.

John Joseph Tobin filed for allowance in the probate court for Ramsey county an instrument purporting to be the last will of Kate Ludwig, deceased. Eliza Haack and another filed objections, and from an order refusing to allow the will the proponent appealed to the district court for that county. In the district court the case was tried before O. B. Lewis, J., who found in favor of the objectors, and directed judgment affirming the order of the probate court. From a judgment entered pursuant to the findings, the proponent appealed. Affirmed.

*J. F. George*, for appellant.

*Charles N. Bell* and *Geo. E. Budd*, for respondents.

BROWN, J.

This is an appeal by J. J. Tobin from a judgment of the district court of Ramsey county affirming an order of the probate court of the same county refusing the probate of the will of Kate Ludwig, and also from an order denying his motion for a new trial.

It appears from the record that Kate Ludwig, at the time of her death, in July, 1898, was a widow without children, leaving surviving her, as next of kin, three sisters and the children of a deceased brother. She owned certain real and personal property at the time of her death, and attempted, at least, to dispose of it by her last will and testament. Some time after her death the appellant, J. J. Tobin, who is in no way related to the deceased, filed with the probate court what purports to be her last will and testament, and petitioned that it be allowed and probated. Due notice of his petition was given, and at the time set for hearing the next of kin of deceased above named appeared, and opposed the will; claiming that it had not been executed in conformity to law, and for other reasons not necessary to be stated. The probate court rejected the will, on the ground that it was not shown to have been executed in accordance with the requirements of the statute on the subject. The district court, on appeal, came to the same conclusion, and this appeal is the result.

To prove the execution of the will, appellant called one Sheire, who testified that some time in February, 1897, the deceased requested him to draw a will for her to execute; that he did so, drawing and preparing it in accordance with her directions, and delivered it to her for execution. The subscribing witnesses were then called, and testified as follows, omitting portions of the evidence not material, to wit:

Mrs. Clara Eggert: "Did you know Kate Ludwig? A. Yes, sir." "Q. Did she ever speak to you about making a will? A. One time she spoke to me about making a will. Q. About when was that? A. A short time before she asked us to sign the will,—asked us into her house to sign the will. A short time before that she spoke to us about making a will, and asked us if we would be willing—

my husband and I—to sign it, and I said, 'I guess so.' Q. To sign it as witnesses, do you mean? A. Yes, sir. Q. When did she next speak to you about it? A. The next time she spoke to us about it was the day that she came in, and said she was ready for us to sign. Q. Her will? A. I don't remember. I can't say positively whether she mentioned the word 'will' or not, but she spoke to us before about her will; yes. Q. She came in, and asked you—What did she say the second time? A. She gave me to understand that she was ready for us to sign, but whether she used the words 'my will' I don't remember that, but I understood that it was her will, because before she had asked us to sign her will." "Q. You went into her house with your husband then, did you? A. Went into her house with my husband. Q. Do you remember how you went in there? A. We went from the little hall through the parlor, into the dining room, and she had on her dining-room table a pen and ink stand, and paper covered over, as she said, her will, and she sat down to the table, took the pen and ink, and sat down to the table," "but I couldn't see what she was doing, whether she was writing, or what she did; I can't say. Q. Did you see her do anything? A. I saw her hand move, but I didn't know what she was doing. Q. Why didn't you know? A. Well, it didn't impress me that she was writing. Q. Where were you sitting from her? A. I was sitting— Well, just as though I sat a little further back from this gentleman, right here. Q. You sat behind her?" "You could see the pen in her hand, could you? A. I could see the pen in her hand. Q. And did you see her make any motions? A. I saw her go through motions, yes, as though she were writing, but it didn't impress me that she was writing at the time. Q. What did she then do, if anything? A. She then got up, and handed the pen to my husband, and he sat down, and wrote his name, and then I sat down, and wrote mine beneath it." "Q. Is the paper presented to you now, the will proposed in this case, the paper which was on the table that you refer to? A. I can't say whether it is the paper, as I didn't see the paper. It was all covered up, excepting the two lines, where we wrote our names. * * * Q. Is that your signature on that paper?" * * * "A. Yes, sir; that is my signature." "Q. Did you observe any other writing on the paper at that time? A. No, sir; I did not; it was all covered up with a sheet of paper. * * * The only thing I saw was my husband's name. Q. There was nothing visible to you on that paper except your husband's name? A. That was all I could see."

Cross-examined: "Q. With the exception of your husband's name and your own name, did you see any writing then on the paper that you and your husband signed in Mrs. Ludwig's house? A. No, sir; none that I can think of,—none whatever. Q. Is there

any writing on the paper except what you and your husband wrote, so far as you know? A. I don't know, because it was covered up. Q. If there was any, you didn't see it? If there was any writing on the paper, except your husband's name and your name, you didn't see it? A. No, sir." "Q. Now, Mrs. Eggert, you have no interest in this one way or the other? A. None whatever." "Q. Did Mrs. Ludwig say anything to you after you got into the house? A. All she said after we had signed the will was, 'Well, you both know that I am not crazy.' That is all she said." "Q. Well, after she had finished at the table," "did she say anything to you? A. She just handed the pen to my husband." "I don't know whether she said anything. I didn't pay any particular attention to it." "Q. She made no remark whether she was signing her will? A. No, sir. Q. After she got up, didn't she say that, 'I have signed this instrument; this is my will; I want you to witness it'? A. No, sir."

Fred C. Eggert, the other subscribing witness, testified:

"Q. What did you observe when you went into the house? A. Went into the house in the hall, and the front room, through the archway, and on the dining-room table, I guess it was, I seen this instrument there,—paper, and the pen and ink. She stepped forward, picked up the pen, went across the paper, and motioned on the paper, as I understood by, to show me where to sign." "Then I stepped forward to sign my name, and then I handed the pen to my wife, and my wife signed. Q. Did she ask you there to sign? A. Not in her house; she asked that in my house." "Q. She took up the pen and motioned over the paper, and she got up, and handed you the pen, did she? A. Yes. Q. Did you see whether she was signing or writing or not? A. No. I see, as soon as I went towards the table, I see that it was blank, and covered up,—saw it was covered up, to keep it secret,—and I stepped back, and she motioned, and I stepped forward, and I signed it. Q. You thought she didn't want you to see? A. I saw it was a secret; therefore I didn't read anything; wouldn't question to sign anything, but I trusted to Mrs. Ludwig's honesty. I trusted to her honesty that that was what she wanted us to sign. Q. What was? A. The will. Q. What makes you think it was the will she wanted you to sign? A. Because she asked us previous." "Q. Did she say anything else to you about that, why she wanted you to sign a will or anything? A. Not to me. My wife,—she mentioned something to my wife, and she told me." "Q. When you came to sign, did you have to open the will to sign it? A. No, sir." "Q. Was there anything else visible there? A. No. Q. Didn't you see any writing at all? A. No, sir. Q. Upon the paper? A. No, sir. Q. Was the bracket and the word 'Witnesses' there afterwards?

A. Not to the best of my memory." "I didn't see any writing. Q. Of any kind whatever? A. No, sir. Q. Except your own signature and your wife's signature. You say that, after you and your wife got into the house there, you found the paper there on the table. Did she prepare it there before you came in, apparently? A. It was all prepared. It was that way—found it that way— when we came in. Q. And all she said to you, as I understand, while you were there in the house, was, after you had signed and your wife had signed, she then says, 'Now, you both see that I am not crazy?' A. That is all that was said." "Q. Could you see the paper all the time from the time that you went in there? A. Oh, yes; yes, sir. Q. Did you see where she put the pen on the paper? A. Not exactly. I seen about where she placed it. She motioned on that paper when we signed it." "Q. When you came into the dining room, did she sit down at the table? A. Yes, sir. Q. Did you see her take the pen in her hand? A. Yes, sir. Q. Did you see her dip it in the ink? A. No, sir. Q. You saw her take the pen in her hand? A. Yes, sir. Q. Where did you stand with reference to where she was? A. I was away probably three or four feet. Q. She was sitting at the table? A. Yes. Q. You were looking at her in a casual way, were you? A. Yes, in a way, not in an interested way. She sat down, and made a motion just a moment, and got up. Q. Do I understand you to say that in making that motion your idea was that she intended to show you where to sign? A. Yes. Q. While she was sitting there at the table? A. Yes. Q. You didn't see her signature? A. No. Q. Or write? A. No, sir. Q. Did you see her cover the paper or uncover it all? A. No, sir."

Other witnesses, familiar with the handwriting of Mrs. Ludwig, testified that the signature to the will was, in their opinion, written by her. The will leaves the entire estate of the testatrix, with the exception of a few minor bequests, to Tobin, who was in no way related to her, but had occupied a room in her house for a few years prior to her death.

The question presented to this court is whether the finding of the trial court that the will was not executed as required by law is justified by the evidence, or whether such finding is so clearly against the evidence as to justify a reversal.

The particular point made by respondents against the sufficiency of the evidence is that the subscribing witnesses to the will did not attest its execution; that they did not see the testatrix sign the same, neither did they see her signature, nor know that she had

signed it, when they attached their names; neither did she say or declare that she had signed it, or that the particular paper was her will. At the time the witnesses attached their names, the paper or will was entirely concealed from their view. It was entirely covered with another paper. Does this evidence sufficiently show an attestation by the witnesses of the execution of the will? Does it show a compliance with the statute? Our statutes on the subject of the execution of wills must be strictly pursued and complied with. Waite v. Frisbie, 45 Minn. 361, 47 N. W. 1069.

The section pertinent to the question under consideration (G. S. 1894, § 4426) is as follows:

"No will   *   *   *   shall be effectual to pass any estate, real or personal,   *   *   *   unless it is in writing, and signed at the end thereof by the testator, or by some person in his presence and by his express direction, and attested and subscribed in his presence by two or more competent witnesses;   *   *   *."

A great variety of decisions are to be found in the books, both in England and in this country, construing and expounding statutes similar to this, and in one respect they are nearly uniform, and that is that the requirements of the statutes must be followed and complied with, with reasonable strictness. Any substantial departure, in the manner of the execution of the will, from the requisites laid down by the statutes, renders the will void. The proponent of a will for probate has the burden of proof to show its due execution. In this case Tobin presented the will for probate, and the heirs and next of kin of the testatrix opposed it. The burden was on the proponent to prove that the will was executed in accordance with the statutes. In re Layman's Will, 40 Minn. 371, 42 N. W. 286. There is a very marked distinction between "attesting" and "subscribing" a will. It is very clearly pointed out by Robertson, C. J., in Swift v. Wiley, 1 B. Mon. 114, 116:

"As the statute requires two witnesses to the publication of a will disposing of real estate, the paper subscribed by the witnesses must, of course, be completed as a legal will at the time of attestation.   *   *   *

"To attest the publication of a paper as a last will, and to subscribe to that paper the names of the witnesses, are very different

things, and are required for obviously distinct and different ends. Attestation is the act of the senses, subscription is the act of the hand; the one is mental, the other mechanical, and to attest a will is to know that it was published as such, and to certify the facts required to constitute an actual and legal publication: but to subscribe a paper published as a will, is only to write on the same paper the names of the witnesses, for the sole purpose of identification. There may be a perfect attestation in fact, without subscription."

And we may add to this that there may be a subscription in fact without attestation. The Kentucky statute is identical with that of this state. It requires the will to be "attested and subscribed by two or more witnesses." We find the rule to be uniform, so far as our examination of the adjudged cases has extended, in all the states of this country having a statute similar to ours, and in England under the statute of frauds substantially the same, that to constitute a legal and valid attestation the testator must either sign the will in the presence of the witnesses, or acknowledge his signature to them, or in some other way clearly and unequivocally indicate to them that he has signed and executed the same. Otherwise, the witnesses attest nothing.

In this case the will was not signed in the presence of the witnesses, they did not know that it had been signed by the testatrix, nor did she indicate to them in any way that she had signed it. She kept the entire paper from their view, and they saw nothing except their own signature. On this subject, see Schouler, Wills (2d Ed.) § 330; Swift v. Wiley, 1 B. Mon. 114; Reed v. Watson, 27 Ind. 443; Cassoday, Wills, § 114, et seq.; Id. § 133, et seq.; 1 Jarman, Wills (6th Ed.) 113; Chase v. Kittredge, 11 Allen, 49; In re Will of Mackay, 110 N. Y. 611, 18 N. E. 433; Simmons v. Leonard, 91 Tenn. 183, 18 S. W. 280; Chisholm's Heirs v. Ben, 7 B. Mon. 408; Lewis v. Lewis, 11 N. Y. 220; Combs v. Jolly, 3 N. J. Eq. 625; 29 Am. & Eng. Enc. 209, and notes.

A will is the solemn disposition of one's property, to take effect after death. We do not lose sight of the sacredness or sanctity of such an act, or of the right of the person to so dispose of his property. Such right is to be upheld, and wills properly executed will be sustained, regardless of the particular disposition of the

property of the testator. But we must not lose sight of or overlook the fact that the right to dispose of one's property in that manner is purely statutory. And, to be effectual, the statutory requirements must be complied with.

In the light of the authorities above cited, and the law as we believe it to be, we hold that the findings of the trial court are supported by the evidence, and the judgment and order appealed from are affirmed.