## MAXWELL *v*. LAKE *et al.*

[88 South. 326, No. 21720.]

1. WILLS. *"Attested" held broader than "subscribed;" purpose of re-
   quirement of two witnesses stated; duty of attesting witnesses
   stated; instruction as to due execution held improper.*

   The word "attested," used in section 5078, Code of 1906 (Heming-
   way's Code, section 3366), is broader in meaning than "subscribed,"
   and the purpose of the statute in requiring two witnesses to attest
   the will is to have more than the mere signatures to the will. It
   is the duty of the attesting witnesses under the statute to observe
   and see that the will was executed by the testator, and to observe his
   capacity to make a will; and where the testator did not sign the
   will in the presence of one of the witnesses, nor declare his signa-
   ture, nor identify the paper or signature, nor declare. it to be his
   will, it was improper to instruct the jury that the will was duly and
   legally executed.

2. WILLS. *In determining undue influence, jury may consider whether
   disposition of property appropriate and just.*

   In a will contest in which the issue was whether the will was pro-
   cured through undue influence of the proponents, it was error to
   instruct the jury that "the jury must not consider in this case
   whether or not the disposition made by the testator is appropriate,
   or proper, or just, but the sole question for the jury to determine
   is whether the paper propounded is the true last will and testament
   cf W. T. Smith." In determining whether a will is procured by
   undue influence, the jury may consider along with all the other
   evidence whether the will is appropriate, proper, or just.

APPEAL from chancery court of Benton county.

HON. J. G. MCGOWEN, Chancellor.

Suit by Mrs. E. A. Maxwell against Minnie Lake and
others, to contest the will of W. T. Smith, deceased. Judg-
ment for defendant, and plaintiff appeals. Reversed and
remanded.

*W. A. McDoland, R. J. Gresham and Wilson & Arm-
strong,* for appellant.

*Thos. E. Pegram* and *Lester G. Fant,* for appellees.

ETHRIDGE, J., delivered the opinion of the court.

The appellant, Mrs. E. A. Maxwell, filed a bill in the chancery court to contest the validity of an alleged will by W. T. Smith, in which his property, real and personal, was bequeathed and devised to the appellees. The alleged will is in the following words:

"In the name of God, amen. I, W. T. Smith, being of sound body and mind, do make this my last will and testament.

"First, to pay all my just and honest debts and the balance of my real estate and personal property to be equally divided to Mamie Lake, Lucretia Smith, Pedro Smith, and L. B. Keel. They are all to share alike and appoint Mamie Lake, and Lucretia Smith sold administrators without bond, and also guardian for L. B. Keel.

"Witness my signature, this day March 29th, 1917.

"[Signed]    W. T. SMITH.

"Witness:

"E. C. JONES.

"G. E. JOHNSON, M. D."

After the death of Smith, the will was probated before the clerk of the chancery court of Benton county on the affidavit of the witness Jones, and letters appointing the said Mamie Lake and Lucretia Smith executrixes were issued by the clerk, whereupon a *caveat* was filed by the appellant, and a bill to have said will declared null and void and the probation set aside was filed by the appellant. Answer was filed taking issue with the bill filed by the complainant and the chancellor, on motion, made up issues on said contest as follows:

(1)   Did W. T. Smith declare and execute the instrument propounded for probate as his last will, and was it attested by two credible witnesses in his presence?

(2)   At the time of the alleged execution of the alleged will, did said W. T. Smith have mental capacity to make a will and dispose of his property?

(3)   Was the paper dated March 29, 1917, made and executed by the said Smith of his free will, or was it the result of undue influence exercised by Mamie Lake, Lucretia Smith, or Pedro Smith?

Upon the trial, the witness Jones testified that Smith signed the alleged will in his presence some time during the year 1917; that he thinks it was in March, 1917; that he signed as a witness at the same time; that after he signed the instrument Smith put it in his pocket, and they went to Holly Springs; that in March, 1920, he carried the witness Dr. G. E. Johnson out to Smith's house, Smith being sick at the time, and after Dr. Johnson treated Smith that he (Smith) said, "Dr. Johnson, I want you to witness my will," and then told Mamie Lake to get it, and she brought it and laid it on the desk, and when Dr. Johnson got through rubbing Mr. Smith, he (Dr. Johnson) went over and sat down by the desk and wrote his name; that Mr. Smith could have seen Dr Johnson when he was signing it if he had looked at him; that when Dr. Johnson signed it, the witness blotted his signature, folded the paper up, and handed it back to Mamie Lake; that the witness does not remember where he told him to sign it, but he told him that the witness had signed, and that he wanted him to witness it; he did not think that Smith told Dr. Johnson that he (Smith) had signed it. The witness Jones further testified that this was the only paper to which he had witnessed the signature of Mr. Smith.

Dr. Johnson testified:

"In March, 1920, I was called over the telephone at Holly Springs, Miss., by Mamie Lake, to see W. T. Smith, who was sick. After examining and prescribing for Mr. Smith, as I was getting ready to leave, Mamie Lake said to Mr. Smith. 'Don't you want Doctor to witness that paper?' He said, 'Yes, you had better get it, and let him sign as a witness.' She brought me a piece of paper folded in such a way that I could not see anything visible except the word 'Witness,' and the name of E. E. Jones beneath this word. I signed the same as a witness. Told Mr.

Smith I hoped he would feel better, and bade him good-by." That Mamie Lake brought in the paper direct and did not take it to Mr. Smith and that it was not shown to Mr. Smith to his (Dr. Johnson's) knowledge. That Mr. Smith did not sign the will in his (Dr. Johnson's) presence and that Mr. Smith did not say anything about this being his (Mr. Smith's) signature to the will. That Mr. Smith could not see the paper while he was signing it as he was between Mr. Smith and the paper. That Mr. Smith's physical condition was not good and that he was suffering from auto-intoxication which produced fever, making his mental condition like that of a person naturally with fever.

Dr. Johnson further testified that he visited Mr. Smith on March 29, 1917, morning and evening; that he was a very sick man, suffering from obstinate constipation, or a form of locked bowels; that his mental condition was somewhat impaired. As to making a will, of course he could make a will, but he thought a man should be normal when he made his will, and Mr. Smith's condition was below normal, but not to the extent of being insane. Dr. Johnson also testified that he did not see Jones sign the paper; that Jones was present when he (Dr. Johnson) signed a paper in 1920.

Subsequent to the making of this alleged will, Mr. Smith was removed to Memphis, Tenn., to a hospital, and while in the hospital, it is testified by a witness named Cocke that Mr. Smith told him to go to Mamie Lake and get his will, and carry it to Holly Springs, and have it put in his strong box; and then said it would be no use to go without a written order, as he had instructed Mamie Lake not to let any one have his papers without a written order, and that he thereupon wrote and signed an order to Mamie Luke to deliver to the witness Cocke his will, which he said had been witnessed by Dr. Johnson and Earl Jones, and to carry it to Mr. Fant, at Holly Springs, and tell Mr. Fant to look after it in case he Smith) died, and to see it was given effect. That said witness Cocke took the order to

Mamie Lake, and got what purported to be the alleged will, and carried it to Holly Springs as requested.

There was evidenct to show that Mr. Smith lived in the house with Mamie Lake and that she had great influence over him, bought goods on his credit, signed checks with his name by her, and wrote orders for him in his business; that she kept his accounts and stayed at the house and looked after his home. There was also evidence that Mr. Smith was the reputed father of Lucretia and Pedro Smith, and evidence that he had expressed his intention of leaving his property to his negroes, as they had stayed with him and helped him to make the money; that he did not have any people that cared anything for him, and he did not care anything for his people; that he had made his will as he wanted it. Some of the witnesses for the contestant testified that Mr, Smith was crazy about negroes.

Mr. Smith had accumulated some sixty or seventy thousand dollars worth of property, and his nearest relation was the contestant, who was an aunt of Mr. Smith.

On the evidence the chancellor gave a peremptory instruction that the will was legally and duly executed, and that Mr. Smith had testamentary capacity, and submitted the case to the jury on the question of undue influence. The jury returned a verdict for the proponents of the will, upon which judgment was entered, from which this appeal is prosecuted.

The main contention relied on by the appellant is that it was error for the court to grant a peremptory instruction on the due and legal execution of the will, and the appellant also complains of certain instructions given proponents on the question of undue influence.

The first question presented for determination is: Did the chancellor err in instructing the jury that the will was legally executed? The statute upon which the validity of the execution of the will depends is section 5078, Code of 1906 (Hemingway's Code, section 3366), which reads as follows:

"Every person aged twenty-one years, male or female, married or unmarried, being of sound and disposing mind, shall have power, by last will and testament, or codicil in writing, to devise all the estate, right, title, and interest in possession, reversion, or remainder, which he or she hath, or at the time of his or her death shall have, of, in, or to lands, tenements, hereditaments, or annuities, or rents charged upon or issuing out of them, or goods and chattels, and personal estate of any description whatever, so as such last will and testament, or codicil, be signed by the testator or testatrix, or by some other person in his or her presence, and by his or her express direction; and, moreover, if not wholly written and subscribed by himself or herself, it shall be attested by two or more credible witnesses in the presence of the testator or testatrix."

It will be noted that the statute requires that the will, if not wholly written and subscribed by the testator, shall be attested by two or more credible witnesses in the presence of the testator or testatrix. Was the chancellor warranted, on the evidence in this record, in withdrawing from the jury the determination of the question as to whether the will was properly executed and attested?

The word "attested" is broader in meaning than the word "subscribed," and it was the purpose of the statute in requiring two witnesses to attest the will to have more than the mere signatures of two persons to the will. It was the duty of the attesting witnesses, under the statute, to observe and see that the will was executed by the testator, and that he had capacity to execute the will.

In *Brock* v. *Luckett,* 4 How. (Miss.), 459, at page 483, this court early recognized these two-fold purposes of having witnesses to a will. In discussing the evidence in that case Chief Justice SHARKEY said:

"Whilst we entertain great respect for the opinions of the physicians who testified, and should under more doubtful circumstances consider them conclusive, yet we do not feel at liberty to predicate our opinions on theory, and reject the positive testimony of the four witnesses present at

the execution of the will, whose peculiar duty it was to observe with caution and discernment the condition of the testator's mind."

Witnesses are not only to identify the paper which has been signed by the testator, but they are to prove the execution of the will and the capacity of the testator to execute it, and, in case of their death, their signatures to the will, when proven, are evidence both as to the signing of the will, and as to the capacity of the testator. Formerly, in this state is required all of the subscribing witnesses to prove a will. In other words, all of the subscribing witnesses who were living were required to be produced to give effect to a will.

In *Evans* v. *Evans,* 10 Smedes & M. (Miss.) 402, this court said:

"We are inclined to hold that no will can be proved unless all the subscribing witnesses alive and within the control of the process of the court are produced to testify. In *Chase et al.* v. *Lincoln,* 3 Mass. 236, the court observed that 'the legislature, in requiring three subscribing witnesses to a will, did not contemplate the mere formality of signing their names. An idiot might do this. These witnesses are placed around the testator to ascertain and judge of his capacity, and the heir has a right to insist on the testimony of all the three witnesses to be given to the jury.' In *Sears* v. *Dillingham,* 12 Mass. 358, it was contended that no will can be proved unless all the witnesses are produced to testify. The court said: 'This, as a general rule, is undoubtedly well settled both here and in England.' "

In *Ragland* v. *Green,* 14 Smedes & M. (Miss.) 194, it was held that, where a will of the testator, though attested by the proper number of witnesses for the valid disposition of real estate, is proved by only one of the witnesses, it will not afford sufficient foundation for the devisee under the will to assert title in a court of equity to the real estate, against others claiming title under sales by the representatives of the testator.

The cases show that it was the purpose of the statute to have witnesses to do more than merely sign a paper. Under the present statute, a will may be probated on the evidence of one of the subscribing witnesses, but on a contest involving the execution of the will between the heirs and the devisees, all of the witnesses should be produced to testify both as to the signature of the testator and as to his capacity. As said in *Helm* v. *Sheeks,* 116 Miss. 726, at page 731, 77 So. 820, at page 822:

"The statute requires two witnesses to witness the execution of a valid will, and the purpose of the statute in requiring witnesses is not only to establish the writing or signing of the instrument, but to have witnesses whose business it is to determine the capacity of the testator making a will."

It is true that it is not necessary in this state for the witnesses to see the testator sign a will, but, if he does not sign it in their presence, there must be something to call the witnesses' attention to the fact that it is his will, or that it is his signature, or something to show to the witnesses the purpose for which the signing is requested. The court does not require any particular form of words to be used by the testator, but he must indicate in some way so as to inform the witnesses as to the purpose of their signing the will.

In *Miller* v. *Miller,* 96 Miss. 526, 51 So. 210, this court held that it was not necessary for the witnesses to see the testator sign his will. In discussing the question the court said:

"It is not essential to a valid attestation of the testator's signature, under our statute, that the subscribing witnesses shall see the testator sign the will. It is enough if he shall produce the will, declare it to be his will, and state that the signature appended to the will is his, and that he wrote it."

Of course, if the witnesses see the testator sign the will and then sign as witnesses to that act, with an understanding of the testator's purpose in so doing, it is not necessary

for the testator to publish the will or declare the instrument to be his will, but the making of a will requires a substantial compliance with the statute. If the signature was all that was required, there would be no necessity for witnesses at the execution of a will, because, generally, it would be an easy matter to prove the testator's signature to the instrument. We think that it is the law that the witnesses should see the testator sign the instrument, or that he should declare the signature to the instrument to be his signature. An interesting and well-reasoned case on this subject is found in *Nunn* v. *Ehlert*, 218 Mass. 471, 106 N. E. 163, L. R. A. 1915B, 87, in which that court goes into an elaborate discussion of the principle involved in this case, and the statute there construed reads as follows:

"Every person of full age and sound mind may by his last will in writing, signed by him or by a person in his presence and by his express direction, and attested and subscribed in his presence by three or more competent witnesses, dispose of his property, real and personal."

In that case the signature and writing of the will was concealed from the witnesses. The testator wrote an alleged will on foolscap paper folded, at the top, the whole being in his handwriting. On the next line below the attestation clause, and on the right side of that line, were the words "(Signed) Thomas Nunn." Decedent presented the paper to the witnesses, and asked them if they would sign his will, but kept it so folded while they were signing it that they saw no signature below the fold of the paper. It was held by that court that there was no attestation within the meaning of the statute, and that the will was not therefore properly attested. In the opinion the court quotes with approval from an opinion by Mr. Justice GRAY, in which that jurist said:

"The statute not only requires them (the witnesses) to attest, but to subscribe. It is not sufficient for the witnesses to be called upon to witness the testator's signature, or to stand by while he makes or acknowledges it, and be prepared to testify afterwards to his sanity and due execu-

tion of the instrument, but they must subscribe. This subscription is the evidence of their previous attestation, and to preserve the proof of that attestation, in case of their death or absence when, after the testator's death, the will shall be presented for probate. It is as difficult to see how they can subscribe in proof of their attestation before they have attested as it is to see how they can attest before the signature of the testator has made it his written will." *Chase* v. *Kittredge,* 11 Allen (Mass.) 49, 63, 87 Am. Dec. 687.

The opinion also quotes Mr. Justice ROBERTSON, of the Kentucky court, in *Swift* v. *Wiley,* 1 B. Mon. (Ky.) 114, 117, as follows:

"To attest the publication of a paper as a last will, and to subscribe to that paper the names of the witnesses, are very different things, and are required for obviously distinct and different ends. Attestation is the act of the senses, subscription is the act of the hand; the one is mental, the other mechanical; and to attest a will is to know that it was published as such, and to certify the facts required to constitute an actual and legal publication; but to subscribe a paper published as a will is only to write on the same paper the names of the witnesses, for the sole purpose of identification."

After quoting from numerous authorities that court said:

"Apart from authority, it is manifest that a person does not acknowledge a signature to be his where no signature can be seen. All that he does in such a case is to acknowledge the fact that he has signed. While an acknowledgement of a signature then exhibited to the witnesses is equivalent to signing in their presence, an acknowledgement to the witnesses of the fact that a signature has been made is not the equivalent of signing in their presence. It follows that, where the signature is hidden, there is not the equivalent of the statutory requirement that the writing shall be 'signed' in the presence of the attesting witnesses."

In *Albert* v. *Stafford,* 123 Va. 338, 96 S. E. 761, the Vir-

ginia court held that the purported will, written by one other than the testatrix, and signed and folded up so as to conceal any writing subscribed by two witnesses who did not see the name of the testatrix, even if it was there, and did not know whether she had signed it or not, and were not asked by her to witness it as her will, was not entitled to probate under the Virginia Code.

In *Simmons* v. *Leonard,* 91 Tenn. 183, 18 S. W. 280, 30 Am. St. Rep. 875, it was held that, where the attesting witness did not inspect the instrument to which he signed his name, nor put any mark or sign on it to render subsequent recognition certain, and when he did not know any of its contents, and was not asked to identify it when his deposition was taken, the will was invalid.

In the case of *Luper* v. *Werts,* 19 Or. 122, 23 Pac. 850, it was held, under the Oregon statute requiring every will, in order to be effective, to be in writing, signed by the testator, or by some other person under his direction, in his presence, and attested by two or more competent witnesses subscribing their names to the will in the presence of the testator, that it was necessary to prove the execution of the will that it be shown that the witnesses who subscribed their names to it did so at the request of the testator; that they saw him sign it, heard him acknowledge it, or observed acts which unmistakably indicated that he had signed it.

In the case of *Richardson* v. *Orth,* 40 Or. 252, 66 Pac. 925, 69 Pac. 455, the Oregon court held that the signature of witnesses to a will will not constitute a sufficient attestation thereof when the testatrix does not indicate to them in any way what the paper is, or acknowledge that she had signed it, or that it was intended to be executed by her, the paper being so folded that the witnesses could not see any of the writing.

In *Tobin* v. *Haack,* 79 Minn. 101, 81 N. W. 758, the Minnesota court held under their statute that a last will and testament must be signed by the testator in the presence of the subscribing witness, or, if not so signed, the testator must acknowledge to such witnesses that the signature

thereto attached is his, or in some other way clearly and unequivocally indicate to them that the will about to be signed by them as witnesses is his last will, and has been signed by him. That to "attest" the execution of a will within the meaning of the statute of that state is to witness and observe the execution and signing thereof by the testator, or to be expressly and clearly informed by the testator, before signing as a witness, that he has signed and executed it.

In *Re Coles' Will* (New Jersey Prerogative Court) 47 Atl. 385, it was held that,.where a will was not signed by a testator in the presence of the witnesses, and there is no proof that his signature was acknowledged in their presence, its probate was properly refused by the lower court.

In the case before us, we think that, if the testimony of Dr. Johnson is true, the peremptory instruction for the proponents is wrong. It is clear from Dr. Johnson's testimony that he did not understand the nature of the instrument that he was witnessing; that his attention was not called to the fact that it was a will; that it was not produced by the testator, nor was it examined and identified by the testator after being produced by Mamie Lake, and, if Dr. Johnson's testimony be true, there was a failure to have the will attested by two witnesses. It may be that the jury could infer, from all the circumstances, that.the testator recognized the paper as his will in the hands of Mamie Lake; and it may be that he was not aware of the fact that Dr. Johnson did not read the will or see the signature of the testator; and it may be that the jury would accept Jones' version of what transpired at the time Dr. Johnson signed the will; and it might be inferred by the jury that Jones' version of the will being opened before Dr. Johnson at the time he signed the paper was true in fact, and contrary to the version given by Dr. Johnson. Certain it is that the evidence left the matter of Dr. Johnson's attestation of the alleged will in such shape that the court was not warranted in taking this issue from the jury.

It was also error for the court below to give instruction No. 5 for the proponents. This instruction reads as fol·lows:

"The court charges the jury for the proponents that a man has a right in the state of Mississippi to dispose of his own property by will, as he may choose, just as he would have the right to give it absolutely away in his lifetime; and he has this right to the entire exclusion of those who, but for the will, would be the heirs of his estate; and the jury must not consider in this case whether or not the disposition made by the testator is appropriate, or proper, or just, but the sole question for the jury to determine is whether the paper propounded is the true last will and tes·tament of W. T. Smith."

This instruction tells the jury that in this cause the jury must not consider whether or not the disposition made is appropriate or proper or just, but the sole question for the jury to determine is whether or not the paper propounded is the true last will and testament of W. T. Smith. On the question of undue influence, the jury may, and should, consider, in connection with all the other evidence, whether or not the disposition made by the testator is appropriate, or proper, or just. It has an important bearing upon the question, but, of course, the jury cannot from this alone set aside a will if the proof shows to their satisfaction that the testator was of sufficient capacity to make a will, and was not unduly influenced in doing so. It is argued that this instruction must be read in connection with the other instructions, and, when so read, that it is not erroneous. Of course, the rule is that all of the instructions are read together, but when we read all of the instructions together, the vice of this one is not counteracted or eliminated. There is much evidence in the record from which the jury could infer that Mamie Lake, by reason of her relations to the deceased, had acquired a considerable influence over him, and that her activities in securing Dr. Johnson, and in suggesting to Mr. Smith that Dr Johnson sign· the paper, would tend to show she was exerting her influence to se·

cure to herself and others Mr. Smith's property.    There
are other instructions for the proponents that are subject
to criticism, but we do not hold that they would constitute
reversible error.

For the errors indicated, the judgment will be reversed,
and the cause remanded for a new trial.

*Reversed and remanded.*