KING, P. J.,
for the Court.
¶ 1. Three children of Cecil Harris filed a petition in the Chancery Court of Benton County to have his will declared void. Ap-pellee Ricky Harris, Cecil’s son, was the primary beneficiary under the will and David Harris, Ricky’s nephew and Cecil’s grandson, was the residual beneficiary in the event of Ricky’s death. The court found that the will was valid and the appellants filed this appeal.
¶ 2. On appeal, the following issues were raised:
1. Was the last will and testament of Cecil Harris properly witnessed as required by Miss.Code Ann. § 91-5-1.
2. Whether Ricky Harris, through fraud and undue influence, misled his father into leaving him all of his money and property.
Finding no error, we affirm.
FACTS
¶ 3. Cecil “Bill” Harris (Cecil) had five children with his wife, Learline Green Harris: Ricky Harris, William Henry Harris, Cecil Morris Harris, Norma Harris Hensley and Geraldine Harris Clayton. Cecil’s relationship with his family was somewhat rocky. After his wife suffered a stroke in 1991, Cecil separated from his wife and moved into another house a short distance away. Norma moved in with her mother to take care of her.
¶ 4. During 1995 and 1996, Cecil entrusted Norma with $56,000 in cash. She placed $31,000 in certificates of deposit and kept the remaining $25,000 in a safe deposit box. In June 1997, Learline Harris went into a nursing home, carried by her daughters. Cecil was not happy with this situation and demanded that Norma return the money to him. When the money was not returned as promptly as Cecil expected, there were a couple of confrontations in which each charged the other with assault. On September 7, 1997, Norma and the other appellants went to deliver their father the money. As a result, Cecil filed an affidavit in justice court against Norma for disturbance of family by coming on his property and using abusive lan *1229 guage, a violation of Mississippi Code Annotated 97-35-ll(Rev.2000). Norma states that she returned most of the money to her father, but kept $6,000 to cover her mother’s future burial. After September 1997, the appellants saw Cecil Harris only in passing. Mrs. Harris died on March 20,1998.
¶ 5. In July 1997, Cecil went to see Lynette Hudspeth, the county appraisal clerk, at the Benton County Courthouse. He had known her for more than twenty-five years and asked her to help him prepare a will. She testified that Cecil came to her alone and that he was “very empathetic” about what he wanted in the will and wanted Ricky to have his property with his grandson to be the beneficiary if something happened to Ricky. According to her, Cecil was very upset with his other children for having put his wife in a nursing home. She told him to come back in three or four days to sign the will. Hud-speth located a will which had been probated and used it to type a will for Cecil. On July 14, 1997, Cecil returned to the courthouse and Hudspeth read to him the will she had prepared. They then went across the hall to get Earniece Crawford, the deputy circuit clerk, to have her witness the will along with Hudspeth. Both testified that Cecil signed the will and seemed lucid and “normal.”
¶ 6. The only witness who testified as to any involvement by Ricky in the preparation of the will was Ricky’s ex-wife, Christy Grubbs. They were married in June 1993 and separated in August 1997. According to Grubbs, Ricky told her that “he was going to make sure that he was the only one that was going to get anything and he was going to make sure that [the rest of the family] didn’t.” She testified that Ricky told her he was going with his father to get the will prepared. She also testified that around this time Ricky began spending more time visiting with his father. Her testimony was based solely on what Ricky purportedly told her rather than any direct knowledge of what occurred.
¶ 7. Ricky testified that he and his father had a good relationship, which he described as a “normal father and son relationship.” Ricky testified that he lived with his father when separated from his wife from June 1998 until July 1999, after which he remarried and moved to Ripley. He denied that he influenced his father or went with him to have his will prepared. Ricky stated that he did not know his father had a will until December 1999 when his father gave him the will, $2,000 in cash, and the deed to his property. Cecil Harris died on April 16, 2000.
¶ 8. In their original petition to the court, the appellants argued that an improper inter vivos gift was made by Cecil Harris to his grandson David Harris. Although Norma testified that she returned to her father $52,000, the whereabouts of this money remain unknown. The appellants argued that $30,000 which David used to pay off a loan came from Cecil Harris and that this gift should be revoked. In court, David was able to produce income tax reports showing that he had $30,000 in refunds from the years 1992-1997, and he alleged that this was the source of the money he used to pay off the loan. There was also a question raised as to money given to Ricky, but neither side produced any evidence. The appellants had no evidence as to what happened to the money that Cecil Harris had and this issue was not raised on appeal.
DISCUSSION
1. Was the last will and testament of Cecil Harris properly witnessed as required by Miss.Code Ann. § 91-5-1.
*1230 ¶ 9. Mississippi Code Annotated 91-5-1 requires that for a will to be valid, it must be “attested by two (2) or more credible witnesses in the presence of the testator or testatrix.”
¶ 10. Contrary to the appellant’s assertions, there is no requirement in the statute that the person preparing the will be an attorney or that either or both of the witnesses must question the testator extensively about his or her motivations or intentions in preparing the will. The role of the witness is more limited. “It is the duty of attesting witnesses, under the statute, to observe and see that the will was executed by the testator, and that he had the capacity to execute the will.” Maxwell v. Lake, 127 Miss. 107, 112, 88 So. 326, 328 (1921).
¶ 11. In the present case, one of the witnesses helped prepare the will, had known the testator for more than twenty-five years, was fully aware of the testator’s motives for naming the beneficiary of his estate, and could testify as to the testator’s capacity for executing the will. The second witness, although not as familiar with the testator, was able to provide credible testimony that the testator signed what was represented to be his will and that he seemed fully capable of executing this will.
¶ 12. Lynette Hudspeth testified that Cecil Harris was influenced to have a will prepared by his ill feelings toward the appellants for their role in having his wife placed in a nursing home, rather than from any influence by Ricky. The will was prepared around the same time that Cecil Harris sought to have Norma return the money given to her for safekeeping. Hud-speth testified that she discussed the will at length with Cecil. She also testified that Cecil was lucid and fully capable of executing the will.
¶ 13. The testimony of Earniece Crawford fully supports the conclusion that she was a proper witness to the execution of Cecil Harris’ will. She had Cecil identify himself, the document was stated to be his last will and testament in her presence, she witnessed him sign the document and she signed as a witness in his presence and that of Lynn Hudspeth. Based on her conversation with Cecil, Crawford was able to testify that she had no reason to believe that there was anything wrong with him.
¶ 14. We conclude that the will was properly executed according to statute. This Court has said that our statutes do not require that a will be drafted by an attorney to be valid, and that is true. It must also be noted that our statutes prohibit the unauthorized practice of law. However, that prohibition does not invalidate a will merely because it was prepared by someone other than a duly licensed attorney.
2. Whether Ricky Harris, through fraud and undue influence, misled his father into leaving him all of his money and property.
¶ 15. The appellants were simply unable to offer any proof that Ricky Harris exerted any influence over his father in causing him to execute the will. The only testimony even suggesting that Ricky had taken any affirmative action in this regard came from his ex-wife, who was able to testify only as to conversations which she allegedly had with Ricky. She had no first-hand knowledge and her testimony was fully refuted by Ricky.
¶ 16. In certain cases, an inference of undue influence can be based on circumstantial evidence. Griffin v. Armana, 687 So.2d 1188, 1193 (Miss.1996). In this case, Ricky did begin to see more of his father around the time that the will was executed and later lived with him after he separated *1231 from his wife. But there was no direct testimony placing Ricky at either meeting to prepare the will, and the testimony of Hudspeth who prepared the will clearly stated that it was the negative influences of the appellants which motivated Cecil to create the will. At the time the will was executed, Cecil had asked Norma for the return of his money and she had not done so. Norma’s testimony failed to show that Ricky misled his father into leaving him all his money and property and therefore provides support for the chancellor’s conclusion that there was no undue influence or duress.
¶ 17. We find this assignment of error without merit.
¶ 18. THE JUDGMENT OF THE CHANCERY COURT OF BENTON COUNTY IS AFFIRMED. ALL COSTS OF APPEAL ARE ASSESSED TO THE APPELLANTS.
McMILLIN, C.J., SOUTHWICK, P.J., BRIDGES, THOMAS, LEE, IRVING, MYERS, CHANDLER AND GRIFFIS, JJ., CONCUR.