PIERCE, Justice,
dissenting:
¶ 23. This Court was emphatically clear when it said:
It is not the policy of the law to permit the defeat of the probate of a will because of the failure of the memory of an attesting witness. The right of a testator to make a will and devise his property as he pleases should not, in the execution of that right and the vesting of the property according to the desire of the testator, be conditioned upon any such fact that might so easily thwart and evade all of the intentions and purposes of the testator in regard to his property, and this, regardless of his thorough compliance in fact with the statutes for the making of wills. In other words, if the policy of the law were otherwise, it would be quite possible for an heir who had been disinherited to fraudulently procure one of the subscribing witnesses to a will to testify that he had not subscribed the will as an attesting witness and thereby thwart the attempt of the testator to devise his property. On account of this danger, it is established law that while the testimony of attesting witnesses denying or impeaching the execution of the will is to be considered and may be sufficient in some cases to prevent probate, it is, nevertheless, to be viewed with caution and suspicion and it is usually entitled to little credence, and a proponent, obliged to call an attesting witness as a witness, is not bound by his testimony.
Warren v. Sidney’s Estate, 183 Miss. 669, 184 So. 806, 809 (Miss.1938) (emphasis added).
¶ 24. Because of this, and with great respect for my learned colleagues in the majority, I must dissent from today’s opin *1197 ion. While the majority discusses the supposed lack of knowledge possessed by the two witnesses to the will, it overlooks the constructive publication present in this matter. I agree that either express or constructive publication of a will to the attesting witnesses is required for valid execution of that will, and that Tyson v. Utterback, 154 Miss. 381, 122 So. 496, 498-99 (1929), must be overruled where it holds otherwise. However, I disagree that constructive publication is not present in the matter before us today. Heeding this Court’s warning in Warren, and considering the very inconsistent testimony of the two witnesses to the will at trial, I would find that these witnesses understood that the instrument they witnessed at the People’s Bank was Howard Griffith’s Last Will and Testament at the time they signed it.
¶ 25. This Court has long defined publication as “the act or acts of the party, by which he manifests that it is his intention to give effect to the paper, as his last will and testament.” Watson v. Lewis Pipes, 32 Miss. 451, 1856 WL 4030, *11 (1856). Furthermore, we have said, “the formal publication of a will is unnecessary. A will may be good, under the Statute of Frauds, without any words of the testator declaratory of the nature of the instrument or any formal recognition of it, or allusion to it.” Id. We also have said, “publication and attestation of a will may be by construction. One may speak by his actions as well as by word of mouth.” Green v. Pearson, 145 Miss. 23, 110 So. 862, 864 (1927). We further explained that “[i]t is sufficient that enough is said and done in the presence and with the knowledge of the testator to make the witnesses understand that he desires them to know that the paper is his will, and that they are to be the witnesses thereto.” Id. (citing 28 RC.L. p. 127, § 82).
¶ 26. In Maxwell v. Lake, 127 Miss. 107, 88 So. 326, 328 (1921), we said:
[I]f [the testator] does not sign [the will] in [the witnesses’] presence, there must be something to call the witnesses’ attention to the fact that it is his will, or that it is his signature, or something to show to the witnesses the purpose for which the signing is requested. The court does not require any particular form of words to be used by the testator, but he must indicate in some way so as to inform the witnesses as to the purpose of their signing the will.
Id. (emphasis added).
¶ 27. Turning to the matter at hand, Patrick Bell testified that Howard Griffith was his employer and asked him to “witness something” for him, and he did so at the People’s Bank in Magee. When asked how many times he signed, Bell responded, “I’m not sure.... Two times, I think.” Bell testified that, had he known the document he was signing was a will, he would not have “witnessed it” because “Mr. Howard was sick ... something was wrong with him, you know, mentally.” However, on cross-examination, Bell testified that Howard Griffith seemed to be of sound mind the day he signed his will.
¶ 28. When asked why he signed the 2006 affidavit, Bell responded, “I didn’t recognize the [will and attached affidavit]. I couldn’t be sure that was my signature.” On cross-examination, Bell admitted that he did not know who had prepared the 2006 affidavit, but that Howard’s son, Jimmy Griffith, gave it to him to sign. He admits that the 2006 affidavit is untrue insofar as it states Bell was told he was witnessing a power of attorney. Bell further admits that the 2006 affidavit was incorrect where it states that his signature on the will was a forgery. He testified that he “didn’t recognize any of the documents,” but he does recognize that his signature is, in fact, on the documents.
*1198 ¶29. Eric Scott, when asked how he got from his place of employment to the People’s Bank the day the will was signed, replied “I’m really not sure ... But if my memory serves me well and so much has gone on. I think ... I may have driven my own vehicle there.” (Emphasis added.) When asked how many times he signed his signature that day, he responded, “Honestly, I only remember signing in one place ... but I understand that my signature is on ... those documents.” He then agreed that he might have signed more than once or twice. Scott went on to say, “I don’t know what I was witnessing.” When asked what state of mind Howard Griffith was in at the bank, Scott responded, “he basically seemed like himself.” Scott admitted on cross examination that the 2006 affidavit was invalid. When asked if he remembered signing the affidavit which was made part of the will, Scott said he did not remember.
¶ 30. As discussed in the majority opinion, the signatures of Scott and Bell appear three times on the will and the attached affidavit. Each man’s signature is under the word “WITNESSES” to the left of Howard Griffith’s signature on his will. Each man’s signature is under the “CERTIFICATE,” which plainly stated three times that the document they witnessed was the “Last Will and Testament” of Howard Griffith. Finally, each man’s signature is affixed to the “AFFIDAVIT OF SUBSCRIBING WITNESSES,” wherein both give sworn statements that they are the “subscribing witnesses to a certain instrument of writing purporting to be the Last Will and Testament of Howard Griffith” and that “Howard Griffith was then of sound and disposing mind and memory.” The affidavit was signed and sealed by Judy Lofton, a Notary Public. Based on her testimony, both men had to have produced identification in order to sign the affidavit. Furthermore, there are handwritten physical addresses underneath the signatures of both men on the affidavit.
¶ 31. Based on the less-than-consistent testimony of Bell and Scott at trial, and this Court’s strong warning in Warren that “testimony of attesting witnesses denying or impeaching the execution of the will ... [should] be viewed with caution and suspicion and it is usually entitled to little credence,” I am of the opinion that the trial court was manifestly in error for holding that the witnesses did not understand that the document they signed was Howard Griffith’s Last Will and Testament and the will was not duly executed. Warren, 184 So. at 809. The majority opinion clearly lays out the evidence before the trial court: “(1) the will, which included the ‘certificate’ and ‘affidavit of subscribing witnesses’; (2) Scott’s and Bell’s 2006 affidavits; and (3) Scott’s and Bell’s testimony at the hearing.” (Maj. Op. ¶ 13).
¶ 32. Both Scott and Bell testified that the 2006 affidavits were incorrect and untruthful. Fui’thermore, their testimony at the hearing, which is to be viewed with suspicion under Warren, revealed that each witness was unclear in his recollection of the events that unfolded the day they witnessed Howard Griffith signing the purported will. Scott testified that “so much [had] gone on” between the time the will was signed and the hearing, and that he did not remember how many times he had signed the will. He also stated that he did not remember signing the AFFIDAVIT OF SUBSCRIBING WITNESSES at all, but admitted it was his signature on that document. Bell testified that he did not recognize the will or the attached affidavit. He did not remember how many times he had signed the will, and although he felt Howard Griffith was sick, he agreed that Howard seemed to be of sound mind the day he signed the will.
*1199 ¶ 33. The testimony clearly impeached the 2006 affidavit, and the witnesses’ stories are plagued with discrepancies. Furthermore, the testimony of two subscribing witnesses attempting to invalidate the execution of a will is deserving of little credence under Warren. The testimony revealed that it was Jimmy Griffith — who stood to inherit through intestate succession if Howard’s will was declared unduly executed — who presented the witnesses with the grossly inaccurate 2006 affidavits. It is this very type of evidence the Warren Court warns us to view with caution and suspicion. Warren, 184 So. at 809.
¶ 34. What is clear from the record, then, is that Scott and Bell signed Howard Griffith’s will as witnesses, and signed both a CERTIFICATE and sworn statements in an AFFIDAVIT OF SUBSCRIBING WITNESSES that clearly indicated the document at issue was the Last Will and Testament of Howard Griffith. Bell testified that Howard signed the will in their presence, and this, coupled with the clear and unambiguous language of the CERTIFICATE and AFFIDAVIT OF SUBSCRIBING WITNESSES, constitutes an act “by which [the testator] manifests that it is his intention to give effect to the paper, as his last will and testament” under Watson, 32 Miss. 451, 1856 WL 4030, ⅜11 (Miss.1856).
¶ 35. While this may not constitute formal publication, this meets the requirements for constructive publication as set out in Green, 145 Miss. 23, 110 So. 862, 864 (1927), and Maxwell, 127 Miss. 107, 88 So. 326, 328 (1921). Neither witness testified he was prohibited from reading the words on the document. From the record before this Court, it is clear “that enough [was] said and done in the presence and with the knowledge of the testator to make the witnesses understand that he desires them to know that the paper is his will, and that they are to be the witnesses thereto,” as set forth in Green. The CERTIFICATE and the AFFIDAVIT OF SUBSCRIBING WITNESSES call attention to the fact that the document being witnessed was the Last Will and Testament of Howard Griffith as required for constructive publication by Maxivell.
¶ 36. Finally, the majority, perhaps unintentionally, has placed every will in this state on the crest of a very slippery slope, one which may fill the chancery courts of this state with witnesses who cannot recall the manner by which countless wills were subscribed and attested. For these reasons, I respectfully dissent. Because I would find that the will was validly executed under these particular facts, I would remand the matter to the trial court for a hearing on undue influence.
CHANDLER, J„ JOINS THIS OPINION.