443 So.2d 850 (1983)
Laverne WEBSTER, et al.,
v.
Lee KENNEBREW and Campbell Kennebrew.
No. 53916.
Supreme Court of Mississippi.
December 14, 1983.
Rehearing Denied January 25, 1984.
*851 Wayne E. Ferrell, Jr., Thomas J. Richardson, Jackson, for appellants.
Robert A. Malouf, Malouf & Malouf, Jackson, for appellees.
Before WALKER, P.J., and ROY NOBLE LEE and HAWKINS, JJ.
HAWKINS, Justice, for the Court:

FACTS
Sarah Kennebrew died March 23, 1979, at the age of 91. On November 24, 1976, she was 88.
On March 5, 1980, Lillie Cooper filed for probate in the Chancery Court of the First Judicial District of Hinds County an instrument purporting to be Sarah's last will and testament, bearing date of November 24, 1976. The witnesses to the instrument were David M. McMullan, a Jackson attorney, and his secretary Dorothy T. Givens, who executed and filed affidavits that Sarah Kennebrew signed the instrument in their presence, and at her special instance and request they signed as subscribing witnesses. The affidavits complied with the statute, and the Chancellor on March 5, 1980, entered a decree admitting the will to probate. The will having been admitted to probate in common form, letters testamentary issued and Lillie Cooper was appointed executrix.
On April 16, 1981, Lee Kennebrew and Campbell Kennebrew, grandchildren of Sarah's filed a petition contesting the validity of the will.
The defendants were the remaining beneficiaries under the will, who appear to be nieces and nephew, and grand-nieces and grand-nephews.[1] The two principal beneficiaries appear to be Lillie Cooper and Laverne Webster.
Sarah was married to Daniel Kennebrew, who died intestate in 1952, leaving surviving him Sarah, and three sons: Emanuel, Willie and Mulberry Hayes Kennebrew. Daniel owned real property in Hinds County. After his death Sarah, on December *852 14, 1953, executed a warranty deed to Mulberry for an undivided one-fourth (1/4) interest in certain realty, stating therein she had purchased Emanuel's and Willie's interest, and intended that she and Mulberry would each own an undivided one-half (1/2) interest therein.
The record does not reveal what happened to Emanuel and Willie, but apparently they died without issue prior to Sarah's death.
Mulberry was born in 1906. In 1924 he married Ruth Bell Bennett in Hinds County. Ruth separated from Mulberry and moved to Memphis in 1933. Mulberry obtained a marriage license and married Frances Campbell in 1935, and to this union Campbell was born in September, 1935, and Lee was born in January, 1937. Both children were born in Hinds County. The Chancery Clerk's office of Hinds County and Shelby County, Tennessee, issued certificates that they could locate no record of a divorce from Mulberry and his first wife, Ruth. Mulberry and Sarah were living together when he died intestate in 1971. Lee and Campbell were then living in Michigan, where they also lived when Sarah died.
After the death of Mulberry, Sarah either moved into the home of Lillie Cooper or Lillie moved into her home. Following Mulberry's death, Sarah lived at 620 Erie Street in Jackson until her death.
Laverne Webster is a school librarian in the school system in Jackson. After Mulberry's death she and Lillie assisted Sarah in running errands for her, doing grocery shopping for her, and attending to personal matters. Also, Sarah and Lillie established a joint savings account of over $12,000 in June, 1976, and Laverne and Sarah had joint accounts. Laverne wrote checks on their bank account. On August 22, 1973, Laverne and Sarah went to the Bank of Flora in Flora, at which time Mulberry's name was removed from Sarah and Mulberry's joint account, and another card issued showing the account to be in the name of Sarah and Laverne. Sarah signed by a mark "X". Beside this "X" is typed "Her mark  Can't Write." At the bottom of the card, beneath Laverne's signature is another "X" for Sarah's signature, and beside it in type, "Can't Write." On April 19, 1973, the name M.H. Kennebrew was struck off a joint savings account with the Bank of Flora and a new card issued in the name of Laverne and Sarah. Sarah did not sign this card, either, but Laverne did.
Beginning in 1970, Sarah was seen and treated by Dr. Robert Smith, a family medicine specialist in Jackson. Her main problem was cerebral arteriosclerosis. The medical records show that beginning in 1973 her weight ranged from 80 to 93 pounds. Dr. Smith's medical records dated November 9, 1976, state:
The patient was brought in by a relative requesting a letter that this patient is in good sound mental health at the time of this examination. This patient was questioned and she did appear to be fairly oriented for time, place and person, general fund in information appeared to be good, chest was clear to A & P, weight was stable, abdomen was soft non-tender, extremities within normal limits. Her mental status  she was very well oriented for time, place and person, impression in sight and judgment was questionable. Numerical count was poor. Broad data about usual informational facts was missing. Her mental status seems to be questionable at this time.
Sarah was hospitalized in February, 1971, for cardiovascular disease, marked arthritic changes, chronic hiatal hernia and chronic obstructed lung. She was again hospitalized in October, 1971, following a cerebral ischemia attack secondary to acute renal damage. She broke her hip in January, 1977, and thereafter was confined to a wheelchair.
It was the doctor's recollection that Sarah, for the most part at least, was brought to his office.
Lay witnesses established that beginning at least in 1971 Sarah's eyesight was very poor. Some said she could not read, others that her ability to read was limited. Two *853 testified she could not recognize them by sight.
The known handwriting of Sarah's indicates a person of very little formal education, if any.
Paragraph III of the petition to contest the will makes the following charge: "That the signature reflected on the Last Will and Testament admitted to probate herein is not the signature of Sarah Kennebrew, deceased."
Paragraph IV of the petition alleges the signature was not properly executed, witnessed, and attested as required by law. Paragraph V charges lack of mental capacity to execute the instrument, and Paragraph VI charges the Will was a result of the undue influence of Lillie Cooper and persons associated with her.
The petition requested an issue of devisavit vel non be tried by a jury on the questions of whether Sarah executed the Will, whether it was executed, witnessed and attested according to law, whether she had the testamentary capacity to make a will, and whether it was executed as a result of undue influence from Lillie Cooper and others.
Lillie Cooper, Laverne Webster and other defendants filed a sworn answer on September 17, 1981, in which each made an affidavit denying Paragraph III, as well as Paragraphs IV, V and VI. They also affirmatively charged,
[T]hat the said will was executed by the Decedent, Sarah Kennebrew, and was witnessed by two fully competent and qualified persons: David M. McMullan, attorney at law, and his secretary, Mrs. Dorothy Givens.
They also alleged that while she suffered from physical infirmity, her mind was sound.
On October 2, 1981, Frank Kelley, on behalf of the heirs of the Estate of Edd Kelley, filed a sworn answer, specifically denying Paragraph III, as well as Paragraphs IV, V and VI. In his Seventh Defense, Kelley specifically alleged:
The answering respondent would affirmatively show by way of defense that the signature affixed to the Last Will and Testament of Sarah Kennebrew, a true and correct copy of which is attached hereto as Exhibit 2 and incorporated herein by reference, is the bona fide signature of Sarah Kennebrew ...
On September 17, 1981, shortly before trial, the defendants Lillie Cooper, Laverne Webster, and other defendants (excluding Kelley), filed an amended sworn answer. This answer likewise specifically denied the allegations of Paragraph III, as well as IV, V and VI, insofar as it charged the will was a result of undue influence.
These defendants' amended answer likewise affirmatively charged that the will was executed by Sarah Kennebrew, and duly witnessed.
On October 1, 1981, Kelley filed an amended answer, again denying Paragraph III, as well as Paragraphs IV, V and VI, insofar as it charged the will was a result of undue influence. It also affirmatively alleged the will was executed by Sarah Kennebrew, and witnessed. The Thirteenth Defense affirmatively alleged that the signature to the will, "is the bona fide signature of Sarah Kennebrew."
On June 23, 1981, the petitioner contestants filed the following request for admission to each of the defendant proponents to the will:
1. Please admit that the signature found on Exhibit "A" attached hereto is not the signature of Sarah Kennebrew, deceased.
NOTE: If your answer to the above request for admission is admitted, you are stating that the signature on Exhibit "A" is not the signature of Sarah Kennebrew.
The defendants Lillie Cooper, Laverne Webster, Frank Kelley, as well as the other defendants, each filed the following response to the request for admissions:
RESPONSE. It is denied that the signature found on Exhibit "A" is not the signature of Sarah Kennebrew, deceased.

*854 REQUEST NO. 2. PLEASE EXPLAIN IN DETAIL HOW YOU KNOW THAT THE ALLEGED SIGNATURE OF SARAH KENNEBREW, DECEASED, ATTACHED HERETO AS EXHIBIT "A" IS THE ACTUAL SIGNATURE OF SARAH KENNEBREW.
The sworn answer of Laverne Webster to this interrogatory is, "I saw her sign the will."
The sworn answer of Lillie Cooper to this interrogatory is, "It was her signature because it is her handwriting."
Trial began October 5, 1981. A cousin of the contestants, Tommy Campbell, testified Sarah's eyesight in 1976 was too poor to read, and she could not write in a straight line. Ruth Bell Kennebrew, Mulberry's first wife, testified Sarah's eyesight was very poor in 1971, that Sarah could not recognize her in 1972. She also testified the signature to the will was not Sarah's. She was vigorously cross-examined by counsel for the proponents on her ability to tell Sarah's handwriting.
Thomas L. Packer, a Jackson police officer, and an expert in handwriting, testified as an expert witness for the petitioners. From an examination of the signature to the will and known handwriting, including signatures of Sarah's, he testified the signature to the will was not Sarah's, that it was a forgery. He was first vigorously challenged by a voir dire examination on whether he should be permitted to testify as an expert, and after his testimony before the jury, defense counsel vigorously and at length cross-examined him about his opinion that the signature to the will was not in the same handwriting of known signatures of Sarah's
A. Frank Hicks, of the Mississippi Crime Laboratory, also an expert in handwriting, testified as a witness for the petitioners. He likewise gave an opinion that the writer of the signatures known to be Sarah's was not the same as the one who signed the will. He likewise was thoroughly cross-examined by defense counsel about his opinion. Both experts testified the quality of the handwriting of the signature to the will was very good, and showed no hesitation of motion.
Each of these expert witnesses also gave detailed testimony of their examination of the handwriting specimens, the reasons for their conclusions, and each was vigorously challenged on cross-examination.
Throughout the presentation of the contestants' case in chief, defense counsel objected first to any lay or expert witness expressing an opinion on the handwriting, and thereafter made every effort on cross-examination to show the witness was mistaken in his or her testimony that the signature on the will was not the genuine signature of Sarah's.
When the contestants rested, the proponents made a motion for a directed verdict finding for the validity of the will. The Chancellor sustained the motion, solely as the issue of undue influence. Some discussion then took place in chambers as to whether evidence of a former will would be admitted into evidence in the presentation of the proponents' defense, and counsel for the contestants then made the strategic decision to withdraw any claim of lack of testamentary capacity.
The first witness for the proponents was David M. McMullan. He was the attorney who prepared the will. He testified that he was given information for the preparation of the will, but did not state by whom. On the day of execution, he testified that Mrs. Kennebrew, Mr. Frank Kelley and Mrs. Laverne Webster came to his office. They met in the law firm's conference room, and he went over the legal descriptions, the number of acres, the names of all of the people involved, and asked her if that was what she wanted, and if it was in conformity with her instruction, and she replied "yes." He then testified, "Subsequently to that, the will was executed and my secretary Mrs. Givens and I attested it and we placed it, I believe, in our firm safe." Frank Kelley and Laverne were present throughout.
Asked if he saw Mrs. Kennebrew sign the will, he replied, "I was in the room. I *855 don't remember whether I watched her sign it physically."
Further, he testified he could not remember whether he actually watched her sign the will, all he could remember was her being seated at the table and her being handed a pen after his discussion.
On cross-examination McMullan testified he did not remember watching Sarah sign the instrument, and he could not say she had put her name to the signature.
During the period Lillie Cooper was acting as executrix, following admission of the will to probate in common form, but prior to any contest, McMullan sent copies of the will to all beneficiaries, and he recalled Lee Kennebrew calling him long distance and telling him that the signature on the will was not his grandmother's. He was asked if he had not further told Lee that there were so many people in the office that day he couldn't say for sure who signed the instrument, and testified he did not remember saying this. Asked if he denied making the statement, he replied he did not remember saying it.
McMullan was also cross-examined on his knowledge as to whether the person purporting to be in his office November 26, 1976, was really Sarah. He was questioned about an affidavit he executed on June 23, 1981, in which he stated an individual "purporting to be Sarah Kennebrew" was in his office. This affidavit contains the following statements:
I, David M. McMullan, attorney at law, do hereby state on my oath that an individual, purporting to be one Sarah Kennebrew, requested that I draw a certain Will devising and bequeathing her real and personal property upon her death. That this same individual purporting to be Sarah Kennebrew was ambulatory and, insofar as I could determine, her eyesight was normal. She did not appear to be lame or crippled but did use a walking stick. This same individual read and declared she understood and approved the Will in question and then executed the will in my presence and in the presence of my secretary, Dorothy T. Givens. I did not see anyone assist this individual in the signing of her Will. As far as I know, no other persons were present in the room other than Dorothy T. Givens, Laverne Webster and myself. This individual, whom I believed at that time to be Sarah Kennebrew, executed the Will filed with the Chancery Clerk in Cause No. P-579 [Hinds County] ...
Concerning the affidavit, McMullan testified an attorney for the contestants had first given him a proposed affidavit, which he had revised after showing it to Mrs. Givens and that she had typed the affidavit he executed, as well as taken the oath.
He recognized the affidavit contained language that Sarah was not helped in any way in signing the will.
Again, on cross-examination McMullan testified, "The lady who was there, as far as I know she signed it. I didn't sit and watch her. I don't remember watching her."
He testified she probably had assistance in walking. Asked if she could "read fine", McMullan replied, "As far as I could tell. As I say, I went over all of this orally, verbally with her to make sure because it is a long involved list of people and legal descriptions."
He assumed that she was reading the will, although he was not sure and he testified that he discussed the will with her.
Finally, he was asked:
Q Is it customary, Mr. McMullan, with your firm or your own private practice that when you get ready to write a will for a person you bring in outsiders and let them sit there and go over the will with them?
A I don't know whether that is customary or not. These people apparently were relatives and helping her around; brought her to my offices and I didn't think it was that unusual.
The office file of the attorney was then introduced into evidence, revealing among other things, that he had prepared a previous will for Sarah Kennebrew in 1972, and *856 thereafter a codicil. He was of the belief that the original of these documents had been destroyed.
McMullan further testified he did not read the instrument to her, but that she had read it and he went over it trying to condense what was in there.
Finally, McMullan acknowledged that a certificate to the 1972 codicil stated, "That the above and foregoing codicil was read to Sarah Kennebrew in its entirety," while no such certificate appeared in the file or on the 1976 will.
Mrs. Givens was the next witness for the proponents. She recalled Kelley and Laverne coming with the person purporting to be Sarah. Mrs. Givens did not recall ever having met Sarah prior to this date. She said she left during the conference between McMullan and the clients, and that after a period of time she was called in, and McMullan asked her to be a subscribing witness.
The record reveals:
Q Okay. What happened then?
A First he introduced me, told her my name and my position and then we saw her sign it. That was it.
Q How did she sign it?
A She signed it with the help of Laverne who took her hand. There was a line for her signature.
There was immediate objection to this testimony as contrary to the parties' pleading. Mrs. Givens then interposed:
A I didn't mean to say that she didn't sign her name. It was her hand that wrote it.
The Court permitted her to testify, and she further stated:
A She was real trembly. The will, if I remember, she was pretty old and she was real trembly and, I think, Mrs. Webster guided her hand to the line and held her hand while she signed it.
As to the procedure, she stated:
A Well, you are introduced to the people. You are asked if they want you to be subscribing witness and et cetera. Then we do sign our names in their presence, both the original and a copy. We keep a copy and give them the original, ordinarily.
Beginning with the filing of contestants' petition in April, 1981, on through the proponents' answer, the request for admissions, denials, interrogatories and answers, the affidavit of McMullan, and throughout this trial, up to this point in the testimony of Mrs. Givens, there was never a hint or suggestion by any of the proponents that anyone except Sarah had signed the will. There was no statement or intimation by any of the proponents that any person assisted her. Indeed, the statements and admissions of the proponents and their attorney McMullan were to the contrary, and in the contestants' case in chief, counsel for the proponents vigorously challenged any assertion that the signature to the will was not in Sarah's own handwriting.
Mrs. Givens had no recollection of ever meeting Sarah prior to November 24, 1976.
The proponents next called Laverne Webster as a witness, and over the objection of the contestants, she was permitted to testify. She testified she was Sarah's niece, and she carried Sarah to the attorney's office on November 24, 1976.
A We went to Mr. McMullan's office and he signed, we went in his conference room and he went over the will with her and asked her if she had questions, was that what she wanted. She read it slowly and they talked about it and they came to the end and he asked her if she had any questions and was that what she wanted and she said, "Yes, sir."
BY THE COURT: You can't tell what she said. Just what happened.
A So, he placed the will in front of her and she picked up a pen to sign it after she agreed that's what she wanted. She picked up a pen. I was sitting opposite her and she asked me, "Dolly, will you help me?"
BY MR. MALOUF: I object
BY THE COURT: You can't tell what was said. You can tell what happened.

*857 A I helped her sign  I assisted her in the signing of the will.
In 1972 the attorney's offices were in the Capitol Towers Building in Jackson, and it was in this building that the 1972 will was prepared. Prior to 1976 the attorney and his firm had moved to the Deposit Guaranty Building. Laverne was positive that the 1976 will was executed in the Capitol Towers Building.
On cross-examination she testified McMullan and Mrs. Givens were both in the room when she helped Sarah sign the instrument, and they both saw her help Sarah sign. She testified she was sitting across the table from Sarah, and demonstrated before the jury, with the court reporter, how she reached across the table, placed her hand on Sarah's and helped her sign the instrument. According to her, McMullan was sitting at the head of the table when she reached across and assisted Sarah in signing.
She testified she could not say Sarah read the will, that she looked at it, and as best she knew Sarah did not read the complete will.
Interrogatory Number Seven to the proponents was as follows:
REQUEST NO. 7. PLEASE STATE WHETHER YOU EVER ASSISTED SARAH KENNEBREW IN ANY WAY IN THE PLANNING, DRAWING, MAKING, OR EXECUTION OF HER WILL DATED NOVEMBER 24, 1976.
Laverne's answer to this interrogatory was "no."
When asked to explain this answer, she testified: "I may have misunderstood. I was thinking about the planning, drawing, and making of the will. I didn't help her with the planning, drawing, and making." Her attorney then stated that was his interpretation as well. She admitted that she had conferred with the attorneys in preparing the answers to the interrogatories. She surmised it was an oversight on her part in answering as she did.
She testified she had said all along to her lawyers that she had assisted Sarah in signing the will, and that they knew it. When asked whether her lawyers had attempted to explain "execution" to her, she said she did not remember.
The record also discloses the following:
Q You mean from the very beginning you told Mr. Richardson and Mr. Ferrell that you helped her write the signature?
A No. I helped her; I assisted her.
Q What I am asking you: When did you first disclose this fact to Mr. Richardson and Mr. Ferrell?
A NO ANSWER BY WITNESS.
As to Sarah's eyesight in 1976, she testified that Sarah "could see some but her eyesight wasn't the best at that time." Also, "she could see you if you walked into the room." And, "she could read some but I don't know how well." Laverne agreed that she had been with Sarah on both occasions in 1973 at the Bank of Flora when the bank accounts were changed.
The proponents offered as their final witness Frank Kelley. It developed Kelley had been in the courtroom prior to calling him as a witness, and heard some of the testimony. Upon objection, the Chancellor excluded his testimony. The proponents questioned Kelley in chambers by way of offer of proof.
The jury was instructed, and rendered a verdict against the validity of the will. Decree was thereupon rendered that the will was invalid.

LAW
Miss. Code Ann. 91-5-1 provides in pertinent part:
Every person ... shall have power, by last will and testament, to devise ... provided such last will and testament ... be signed by the testator or testatrix, or by some other person in his or her presence and by his or her express direction.
Appellants strenuously urge that the uncontradicted proof shows the execution of this document complied with the statute.
The question before us is whether a jury issue was made whether there was a compliance *858 with the statute. We are compelled to conclude the Chancellor made no error in submitting this issue to the jury.
This conclusion is forced upon us by the conduct of the proponents. When the petition to contest was answered, the proponents had opportunity to set forth the circumstances under which the will was executed. They knew the contestants were specifically charging the signature to the will was not Sarah's. Yet, their answer denies all such allegations in the petition. Again, on request for admission, they were presented with a golden opportunity to explain how the instrument was executed. They denied the request for admission under oath.
Then, interrogatories were propounded, attaching a copy of the signature to the 1976 instrument, and the proponents were specifically asked to explain in detail how they knew the signature to the will was the actual signature of Sarah's.
Lilly Cooper, who had known Sarah all her life, and with whom Sarah lived the last seven years of Sarah's life, answered under oath, "It is her signature because it is her handwriting."
Lilly Cooper obviously knew something about Sarah's handwriting, and she just as obviously knew it was not Sarah's "actual signature."
Laverne Webster answered under oath, "I saw her sign the will."
The troubling aspect of this matter does not end here. Mrs. Givens, the secretary who testified Sarah was trembly and needed help, also assisted her employer, Mr. McMullan, in preparing the June 23, 1981 affidavit  over a year after suit was filed and about four months from trial. According to Mr. McMullan's testimony, he discussed the matter with Mrs. Givens, she typed it, and she took the oath. This affidavit states, "I did not see anyone assist this individual in the signing of her will."
If Mrs. Givens testimony is given credence, on June 23, 1981, she knew her employer was signing an affidavit giving a distinctly false implication: that no one assisted Sarah in the signing of the will. She and Mr. McMullan obviously would know whoever read the affidavit would conclude Mr. McMullan, as a subscribing witness, actually saw Sarah sign, and that since he saw her sign, he was also making oath nobody assisted Sarah.
It is absolutely beyond belief that Mrs. Given would permit her employer to sign such an affidavit, with her then and there knowing Laverne Webster reached across the table and assisted Sarah in signing the document. And, right in front of Mr. McMullan, who was sitting at the head of the table!
In oral argument before this Court, counsel for the proponents stated he learned the will was not signed by Sarah about a week prior to trial. Yet, counsel did not disclose this to the court or jury at the beginning of trial. Instead, all witnesses, including the experts, who testified this was not Sarah's signature were vigorously and emphatically challenged. It was only after the contestants had put on overwhelming proof that the signature was not Sarah's and rested their case, that any disclosure of Laverne Webster assisting Sarah was brought to light.
We have listed just some of the aspects of this matter which warranted submission of the execution of the will to the jury.
There is, of course, nothing wrong per se in any elderly, infirm or physically incapacitated person having assistance in making a signature and the statute in the execution of wills expressly authorizes another person to affix the testator's signature. Yet, this was never brought to light by the proponents until they had to.
In view of the positive, unequivocal answers of Laverne Webster, Lillie Cooper and Frank Kelley in their pleadings and under oath in discovery proceedings, a serious question is presented on whether contradictory testimony should have been permitted. See: Gates v. Murphree, 286 So.2d 291 (Miss. 1973); Callender v. Cockrell, 217 So.2d 643 (Miss. 1965); Bradshaw *859 v. Stieffel, 230 Miss. 361, 92 So.2d 565 (1957).
Even conceding the testimony was admissible with their explanation, a corollary to this case can be found in homicide prosecutions. Under the familiar Weathersby rule, where the defendant is the sole witness, his testimony must be accepted as true unless substantially contradicted by physical facts of by facts of common knowledge. Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933). Yet, if the defendant has given a prior contradictory statement on any material fact, the rule does not apply, and it then becomes a jury question whether or not to believe the defendant, and the jury whether or not to believe the defendant, and the jury is entitled to take into account his testimony and the pre-trial statement. Harrelson v. State, 217 Miss. 887, 65 So.2d 237 (1953). Moreover, the jury was entitled to consider the signature to the will, Laverne Webster's explanation of how she assisted Sarah in signing the instrument, and the opinion of the handwriting experts on the credibility of the signature being executed under this circumstance.
A jury question is clearly present in this case as to whether the will was executed as required by statute.
This Court has long given the testimony of subscribing witnesses to a will great deference. A duty devolves upon such witnesses greater than witnessing an ordinary instrument. In Fortenberry v. Herrington, 188 Miss. 735 at 747, 196 So. 232 (1940), we stated:
The attesting witnesses must not only witness the signing and publishing of the will by the testator, but it is also their duty to satisfy themselves that he is of sound and disposing mind and memory, and capable of executing a will ... For this reason, in the case of Brock v. Luckett's Ex'rs., 4 How. 459, this court said that the testimony of these subscribing witnesses is entitled to greater weight than the testimony of witnesses who had no such duty to perform, and especially is entitled to greater weight than the testimony of who were not present at the time of executing the will, and especially is this true of those who did not see the testator the day of its execution... .
The attesting witness to a will may express an opinion as an expert upon the testamentary capacity of the testator.
In according this deference, it is our hope that subscribing witnesses be advised by counsel of their corresponding duty to that testator. A witness to a will should be some person acquainted with the testator, and having no interest, direct or indirect, as a beneficiary. He should be impressed with the necessity of specifically observing the testator and other person sign the will. He should be impressed with the necessity of being satisfied that the testator understands it is a will, and that it expresses the wishes of the testator. Finally, the will should be signed in privacy, with no other persons present than the testator, his attorney and the witnesses, unless required by unusual and compelling circumstances. The presence of some persons who could cast cloud or suspicion on this solemn occasion should be scrupulously avoided. In most of the will contest cases which come before this Court, we find one or more of these simple precautions have been ignored.

DEAD MAN STATUTE
It is argued the testimony of Ruth Bell Kennebrew, the first wife of Mulberry and a devisee under the will, violated the Dead Man Statute, Miss. Code Ann. 13-1-7. The testimony of this witness for the contestants was against her own interest as devisee, not to establish her own claim or interest, and therefore was competent. See: Veazey v. Turnipseed, 219 Miss. 559, 69 So.2d 379 (1952); Estes v. Estes, 200 Miss. 541, 547, 27 So.2d 854 (1946); Birchett v. Hundermark, 145 Miss. 683, 694, 110 So. 237 (1926).

CONTESTANTS' STANDING TO SUE
In a separate action the contestants alleged that Ruth and Mulberry were never *860 divorced, and that Ruth was an heir-at-law of Mulberry's. By a separate motion to dismiss, or plea in bar, the proponents sought to dismiss the petition because of the illegitimacy of Lee and Campbell Kennebrew. The Chancellor overruled the motion and plea.
The proponents never denied the contestants were in truth and in fact the natural children of Mulberry's, and therefore the natural grandchildren of Sarah's. Their claim is simply that these two grandchildren, being illegitimate, have no interest in this estate, and no standing to petition the will. A simple answer to this would be the fact that there remains a 1972 will and codicil in which they received a greater share in the estate, and which may very well be subject to probate.
Moreover, on the merits, the record shows there was a ceremonial marriage between Mulberry and Frances Campbell, and thereafter Lee and Campbell were born of this union. Thus, there is no impediment to their inheriting as lawful heirs-at-law of Mulberry's. See: Miss. Code Ann. 91-1-5 (1981 and 1983 supplement); Vance Witt, Admr. v. Mitchell, 437 So.2d 63 (Miss. 1983).

EXCLUDING TESTIMONY OF FRANK KELLEY
The rule was invoked at trial. When the proponents offered Frank Kelley as a witness, the contestants objected. Kelly was a party defendant, a son of Edd Kelley, who was a devisee under the will. Kelley had been in the courtroom the previous day when one of the handwriting experts testified. Because of the violation of the rule, the Chancellor would not permit Kelley to testify before the jury. In chambers the proponents made profert of his testimony by examining him and the contestants cross-examined him. The refusal of the Chancellor to permit his testimony before the jury is assigned as error.
There would ordinarily be the question about the competency of Kelley to testify as violative of the Dead Man Statute. Brief and argument of counsel, however, state Edd Kelley pre-deceased Sarah, and since the will contains no anti-lapse provision, the devise to Edd Kelley lapsed under the statute. See: Miss. Code Ann. 91-5-7.
We have often stated that it is discretionary with the trial judge whether to permit a witness who has violated the rule to testify. In Chilcutt v. Keating, 220 Miss. 545, 71 So.2d 472 (1954), we held that permitting a witness to testify after violating the rule was not error.
In Moore v. Chambers, 199 So.2d 261 (Miss. 1969), we reversed a trial court's refusal to permit a party to testify after first being called as an adverse witness by the opposing side. That case involved some misunderstanding as to the invocation of the rule, however, as well as a party who had already testified as an adverse witness.
In four criminal cases we have affirmed two convictions of defendants when the state, over defense counsel objection, was permitted to call a witness who had violated the rule to testify, and likewise affirmed two convictions of defendants when the circuit judge refused to permit the defense to call a witness to testify who had violated the rule.
In Triplett v. State, 230 Miss. 707, 93 So.2d 654 (1957) and Humphreys v. State, 217 Miss. 909, 65 So.2d 226 (1953), we affirmed where the state, over the objection of the defendant, permitted witnesses to testify who had violated the rule. In Goss v. State, 413 So.2d 1033 (Miss. 1982) and Ford v. State, 227 So.2d 454 (Miss. 1969), we affirmed the convictions of defendants when the circuit judge refused to permit witnesses who had violated the rule to testify as defense witnesses. In Goss we did have some discomfort with the ruling, and suggested it would be preferable for the circuit judge, in the exercise of his discretion, to lean towards admitting the testimony.
From the record, Kelley's testimony in chambers would appear to be somewhat less than completely satisfying to the proponents, and we do not fully understand *861 the contestants objection to his testifying before the jury.
These matters rest within the sound discretion of a trial judge there on the scene, and we are most reluctant to reverse a trial judge on his ruling as to whether a witness who has violated the rule should testify.
Nevertheless, in this case Kelley stated to the Chancellor, presumably under oath, that he had only been in the courtroom about three minutes on the previous day, and we believe he should have been permitted to testify. The right to call a witness is such an important right, we believe, as we stated in Goss, that trial judges should, where they can, lean towards permitting such a witness to testify.
The Chancellor conducted this difficult trial with considerable discernment and ability, and it is with reluctance we feel constrained to reverse on this one question.
There was no cross-appeal on the Chancellor's permitting Laverne Webster to testify, over the objection of the contestants, as being violative of the Dead Man Statute, and we do not address her competency, or whether it was waived by the request for admissions, and the interrogatories propounded to her.
Upon remand, the issues of undue influence and testamentary capacity will not be foreclosed to the contestants. In view of the testimony of the proponents witnesses, there may very well be an issue of undue influence as well as testamentary capacity upon retrial. These witnesses' testimony, coming as a complete surprise to the proponents, would make it unfair to foreclose from the contestants the opportunity upon retrial to also attack the will on these grounds.
REVERSED AND REMANDED.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and ROY NOBLE LEE, PRATHER and ROBERTSON, JJ., concur.
BOWLING and DAN M. LEE, JJ., not participating.
NOTES
[1] The record is not clear as to the relationship of some of the beneficiaries, whether kin by blood or marriage, and it is entirely possible some are no relations. Frank Kelley appears to be a great nephew. One of the attorneys stated in oral argument Laverne Webster was a "distant" cousin.