# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-IA-01557-SCT

*IN THE MATTER OF THE ESTATE OF HOWARD GRIFFITH, DECEASED: GARLAND GRIFFITH*

*v.*

*JIMMY GRIFFITH AND JERRY GRIFFITH*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/04/2008 |
| TRIAL JUDGE: | HON. J. LARRY BUFFINGTON |
| COURT FROM WHICH APPEALED: | SIMPSON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JAY L. JERNIGAN |
| ATTORNEY FOR APPELLEES: | F. KIRK NELSON |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 03/25/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1. In this will contest, the petitioner appeals from the chancellor's order rejecting the probate of the decedent's alleged last will and testament. At issue is whether the last will and testament was properly executed under Mississippi Code Section 91-5-1 (Rev. 2004), when the two attesting witnesses claim they were unaware that the document they signed was a will. We affirm the trial court and find that attesting witnesses to a will must have knowledge of the purpose of their attestation.

FACTS

¶2.   On February 27, 2006, Garland L. Griffith filed a petition to probate the purported last will of his brother, Howard Griffith. A copy of the purported, nonholographic will was attached to the petition. Under the will, Howard devised and bequeathed unto Garland his "home and its furnishings and furniture, together with the five acres, more or less, upon which it is situated . . . cash, bank accounts and certificates of deposit, and . . . [a] Maxima automobile, [a] truck, [a] Jeep automobile, [a] Ford 2000 tractor and [a] lawn mower . . . . [and] two mobile homes and all furnishings and contents situated therein[.]" Relevant to these proceedings, Howard also devised and bequeathed to his sons, Jimmy L. Griffith and Jerry H. Griffith ("Contestants"), "that portion of [his] property upon which Griffith's Barber Shop is located . . . and all of [the] contents, fixtures and furniture in said business . . . . [and the] rest remainder and residue of [his] estate[.]"

¶3.   The purported will bears the signature of Howard Griffith and the signatures of Eric M. Scott and Patrick O. Bell as witnesses. Following the signatures of the witnesses, the will contains a "certificate" providing that:

> We, each of the subscribing witnesses to the Last Will and Testament of Howard Griffith, do hereby certify that said instrument was signed by the said Howard Griffith in our presence and in the presence of each of us, and that the said Howard Griffith declared the same to be his Last Will and Testament in the presence of each of us and that each of us signed as subscribing witnesses to said Last Will and Testament at the special request of Howard Griffith in his presence and in the presence of each other.

This "certificate" also bears the signatures of Eric M. Scott and Patrick O. Bell.

¶4.   Additionally, the will contains an "affidavit of subscribing witnesses" which provides:

2

that the said Howard Griffith, signed, published, and declared the aforesaid instrument to be his Last Will and Testament on July 6, 2005 in the presence of said Affiants . . . that the undersigned Affiants subscribed and attested said instrument as witnesses to the signature and publication thereof, at the special request of Howard Griffith, in his presence and in the presence of each other.

The affidavit concludes with the signatures and addresses of Eric M. Scott and Patrick O. Bell. The affidavit also contains the signature of the notary public, Judy C. Warren Lofton.

¶5. The Contestants filed a caveat against probate, alleging that their father "died without leaving a valid will, in that the purported will is the result of undue influence and is not supported by sworn witnesses."

¶6. Witnesses Scott and Bell filed affidavits ("2006 affidavits"), in which each asserted that he had not witnessed a will, but a power of attorney. Scott and Bell also claimed in their respective affidavits that they had never signed an "affidavit of subscribing witnesses."

¶7. Thereafter, the chancellor conducted a hearing to determine whether the will was duly executed.[1] The chancellor heard testimony from Lofton, Scott, and Bell.

¶8. Lofton testified as to her normal procedure in notarizing a document, because she did not remember notarizing this particular document. Lofton testified that she normally requests identification from the parties; the parties sign the particular document; and she then notarizes the signatures. Lofton identified her signature on the will.

¶9. Scott testified that Elaine Coleman, Howard's niece, asked him to witness Howard's signature on "some documents." Scott agreed and met Howard, Garland, and Bell at a local

---

[1]The chancellor limited the hearing to the issue of due execution and declined to hear evidence or rule on the issue of undue influence.

3

bank. Scott testified that he never spoke with Howard at the bank other than a greeting. Scott testified that no one informed him what he was signing, and that the notary directed him where to sign. Scott further testified that his 2006 affidavit was incorrect, since he was unaware of what he was signing when at the bank. He stated that he did not read any of the documents prior to signing them, and that he would not have signed the documents had he known they constituted a will.

¶10. Bell testified that in July 2005 he worked at the Griffith Barber Shop. Bell further testified that Howard asked him to "witness something," and he agreed. Bell stated that he rode with Howard and Garland to the bank, and the notary directed him where to sign. Bell testified that he did not read the documents at the time he signed them, and that no one informed him that he was signing a will. He also testified that he would not have signed the documents had he known they constituted a will.

¶11. At the close of the hearing, the Contestants requested that the chancellor render a judgment in their favor, arguing there was no genuine issue regarding the publication of the will to the witnesses.[2] The chancellor entered an order rejecting the probate of the will based on the testimony of Scott and Bell. From this order, Garland appeals.

**DISCUSSION**

**I. Whether the chancellor committed manifest error in his findings of fact.**

---

[2]Both Scott and Bell testified that Howard signed the will in their presence.

¶12.    Following the hearing, the chancellor found that Scott and Bell were unaware that they had witnessed Howard's purported last will and testament. This Court has ruled that "the testimony of attesting witnesses denying or impeaching the execution of the will is to be considered and may be sufficient in some cases to prevent probate, [but it is] to be viewed with caution and suspicion and it is usually entitled to little credence." *Warren v. Sidney's Estate*, 183 Miss. 669, 184 So. 806, 809 (1938). Further, if either or both attesting witnesses deny the execution, then the proponents may introduce secondary evidence of the execution. *Id.*

¶13.    Bell's and Scott's testimony was the only evidence, other than the testimony of the notary public, submitted by the parties at the hearing. The proponent of the will, Garland, presented only the testimony of Lofton and failed to introduce any witness or other evidence showing that Bell and Scott had knowledge of the purpose of the attestation. The chancellor had before him conflicting evidence concerning whether the witnesses had knowledge that they were witnessing Howard's will, namely: (1) the will, which included the "certificate" and "affidavit of subscribing witnesses"; (2) Scott's and Bell's 2006 affidavits; and (3) Scott's and Bell's testimony at the hearing. This presented a question of fact for the court, and the chancellor resolved the conflict by ruling that the hearing testimony was the most credible. We have ruled that "when the trial judge sits as the finder of fact, he has the sole authority for determining the credibility of witnesses." *Yarbrough v. State*, 645 So. 2d 867, 869 (Miss. 1994). Further, we reiterate that our trial courts are entitled to deferential review in matters involving questions of fact. *Id.* Because this Court reviews a chancellor's

5

findings of fact under a standard of manifest error, we cannot say that the chancellor erred.

***Goode v. Village of Woodgreen Homeowners Ass'n***, 662 So. 2d 1064, 1070-71 (Miss. 1995) (ruling that the Court applies the standard of manifest error to findings of fact in a will contest). Applying the appropriate standard of review, we fail to see how the chancellor manifestly erred in considering and finding sufficient the testimony of Scott and Bell. We additionally note that this case does not involve witnesses who cannot "recall the manner" of signing the purported will (see dissent at ¶ 36); this case involves two witnesses who testified that they had no knowledge of *what* they were signing, which we find to be a requirement, as explained *infra*.

**II. Whether attesting witnesses to a will must have knowledge of the purpose of their attestation.**

¶14. This Court also must determine whether the chancellor was correct in ruling that attesting witnesses to a will must have knowledge of the purpose of their attestation. In other words, this Court must decide whether the execution of the will complied with Mississippi Code Section 91-5-1, when the two attesting witnesses were unaware that the document they signed was a will. This Court employs a de novo standard of review to a chancellor's legal findings in a will contest. ***In re Last Will & Testament of Carney***, 758 So. 2d 1017, 1020 (Miss. 2000).

¶15. Section 91-5-1 governs the execution of a last will and testament. Miss. Code Ann. § 91-5-1 (Rev. 2004). It provides, in relevant part, that:

> [A] last will and testament, or codicil, [must] be signed by the testator or testatrix, or by some other person in his or her presence and by his or her

6

express direction. *Moreover, if not wholly written and subscribed by himself or herself, it shall be attested by two (2) or more credible witnesses in the presence of the testator or testatrix.*

*Id.* (emphasis added). Section 91-5-1 does not explicitly address any knowledge requirement on behalf of the attesting witnesses. However, we find that our caselaw addressing attestation and publication does address it and is determinative of the case *sub judice*.

¶16. Mississippi Code Section 91-5-1 provides that a will must be "attested" by at least two witnesses. *Id.* This Court examined the meaning of this statutory term in **Batchelor v. Powers' Estate**, 348 So. 2d 776, 776-77 (Miss. 1977). The Court held that "'attestation' includes not only the mental act of observation, but also includes the manual one of subscription." *Id.* at 777. In other words, not only must the witness observe the testator, he must also affix his signature to the document. In 1921, this Court discussed the requirement and purpose of attestation in *Maxwell v. Lake*, 127 Miss. 107, 88 So. 326, 328 (1921). The Court stated:

> The word "attested" is broader in meaning than the word "subscribed," and it was the purpose of the statute in requiring two witnesses to attest the will *to have more than the mere signatures of two persons to the will.* It was the duty of the attesting witnesses, under the statute, *to observe and see that the will was executed by the testator, and that he had capacity to make a will . . . .* Witnesses are not only to identify the paper which has been signed by the testator, but they are to prove the execution of the will . . . .

*Maxwell*, 88 So. at 328 (emphasis added). The Court further explained attestation in *In re Will and Estate of Jefferson*:

7

[Mississippi caselaw] abundantly hold[s] that the purpose of signing by the attesting witnesses in the presence of the testator is *that the testator will know that the witnesses are attesting the testator's will and not another document; that the witnesses will know the same*; these reasons to avoid imposition of fraud on either the testator or the witnesses by substitution of another will in place of that signed by the testator; *and that the witnesses will be reasonably satisfied that the testator is of sound and disposing mind and capable of making a will.*

*In re Will & Estate of Jefferson v. Moore*, 349 So. 2d 1032, 1036 (Miss. 1977) (emphasis added). Furthermore, this Court has provided the following warning regarding attesting witnesses:

*[I]t is our hope that subscribing witnesses be advised by counsel of their corresponding duty to that testator.* A witness to a will should be some person acquainted with the testator, and having no interest, direct or indirect, as a beneficiary. He should be impressed with the necessity of specifically observing the testator and other person sign the will. *He should be impressed with the necessity of being satisfied that the testator understands it is a will, and that it expresses the wishes of the testator.* Finally, the will should be signed in privacy, with no other persons present than the testator, his attorney and the witnesses, unless required by unusual and compelling circumstances. The presence of some persons who could cast a cloud or suspicion on this solemn occasion should be scrupulously avoided. In most of the will contest cases which come before this Court, we find one or more of these simple precautions have been ignored.

*Webster v. Kennebrew*, 443 So. 2d 850, 859 (Miss. 1983).

¶17. In accord with our previous cases of *Maxwell*, *Jefferson*, and *Kennebrew*, we find that an attesting witness must have some knowledge that the document being signed is, in fact, the testator's last will and testament. Therefore, Scott and Bell were not "attesting" witnesses under Section 91-5-1 but merely subscribing witnesses. Curiously, the dissent finds that mere subscription is sufficient to satisfy the requirement of attestation without any

8

citation in support thereof.  Because Scott and Bell had no knowledge of the nature of the document, we agree with the trial court that the will was not properly executed.  However, our analysis of attestation does not end the inquiry.  Had the will been expressly or constructively published to Scott and Bell, this issue would be moot.  As will be explained *infra*, publication coincides with the statute's explicit requirement of "attesting" witnesses.

¶18.   While the statute does not define the term "publication,"[3] this Court has often discussed publication when addressing the requirements of Section 91-5-1 and its statutory precursors.  As early as 1856, contestants to a nonholographic will argued that it was not published in conformity with the statute.  ***Watson v. Pipes***, 32 Miss. 451, 1856 WL 4030, *11 (1856) (reviewing precursor to Section 91-5-1 that was devoid of the term "publication").  The Court found that the attesting witnesses were summoned at the direction of the testator and knew "the *purpose* for which their attendance was required."  ***Id.*** at *10 (emphasis added).  Further, once the witnesses were assembled in the testator's presence, the drafter of the will proclaimed the document to be the testator's will.  ***Id.***  The Court held the evidence was "sufficient to authorize the presumption, that there was due and legal publication of the will, although the evidence may not have directly established a formal and express publication."  ***Id.*** at *11.  The Court defined publication as "the act or acts of the party, by which he manifests that it is his intention to give effects to the paper, as his last will and

---

[3]"Publication of a will means a communication by the testator, or attributable to the testator, that the subject writing is a will."  Robert A. Weems, *Wills & Administration of Estates in Mississippi* § 4:7 (3d ed. 2003).

9

testament." *Id.* The Court further explained that "[t]he statute of this State . . . was copied, literally, from the statute of Virginia, which was taken from the Statute of 29 Car. 2, Ch.3. And it is settled, by authority, in England, that the *formal* publication of a will is unnecessary." *Id.* (emphasis added).

¶19.   In 1921, this Court found there was no requirement for formal publication "if the witnesses see the testator sign the will and then sign as witnesses to that act, *with an understanding of the testator's purpose in so doing*[.]" *Maxwell v. Lake*, 127 Miss. 107, 88 So. 326, 328 (1921) (emphasis added).  Furthermore, this Court repeatedly has reaffirmed that some form of publication is required.  *See generally Green v. Pearson*, 145 Miss. 23, 110 So. 862, 864 (1927); *see also Wilson v. Polite*, 218 So. 2d 843, 850 (Miss. 1969) (ruling that nonholographic wills must have attesting witnesses whose testimony evidences the "instrument was signed, published, and declared by the testator, in their presence, as his or her last will and testament"); *Smith v. Smith*, 185 Miss. 702, 188 So. 305 (1939) (finding a jury issue regarding attestation where "[t]here was no testimony that the alleged testator in any manner personally declared to [the witness] that the instrument was his will at the time of its execution or that he ever requested him to attest it as such"); *Warren v. Sidney's Estate*, 183 Miss. 669, 184 So. 806, 810 (Miss. 1938) (finding testatrix duly executed her will when she "signed same and declared it to be her last will and testament in the presence of said subscribing witnesses, who signed their names thereto as subscribing witnesses in the presence of the testator and at her request").  In *Green v. Pearson*, we found that publication may be accomplished through construction, noting that: "[i]t is sufficient that enough is said

10

and done in the presence and with the knowledge of the testator *to make the witnesses understand that he desires them to know that the paper is his will*, and they are to be the witnesses thereto." **Green**, 145 Miss. 23, 110 So. 862, 864 (1927) (emphasis added).

¶20. However, we note that the 1929 case of **Tyson v. Utterback**, 154 Miss. 381, 122 So. 496, 498-99 (1929), *overruled on other grounds in part* by **Bearden v. Gibson**, 60 So. 2d 655 (Miss. 1952), contains language that expressly contradicts this line of previously noted cases. In **Tyson**, this Court ruled that:

> When publication in the presence of the witnesses is not required, as it is not in our state, then it follows that it is not essential to the validity of the will, when it has been signed by the testator to their personal knowledge, *that the witnesses should know its contents, or that they should know that it is a will*.

**Tyson**, 122 So. at 498 (emphasis added). Therefore, to resolve this dichotomy that exists in our caselaw concerning publication, we expressly overrule **Tyson**'s pronouncement regarding publication and reaffirm our rulings in **Watson**, **Maxwell**, **Green**, **Smith**, **Wilson**, and **Warren**. We find that Mississippi Code Section 91-5-1 requires that attesting witnesses to a will know the purpose of their attestation, even when the testator signs the will in their presence. As noted in our prior cases, either formal or constructive publication will ensure that this knowledge is imparted to the attesting witnesses.[4]

---

[4]We note that the dissent fails to cite one case in which we have held that language in a certificate and affidavit of subscribing witnesses suffices as any form of publication when the witnesses have failed to read those documents and the testator has failed to make any indication that the document in question is a will. We further note that the certificate and affidavit of subscribing witnesses contain "attestation clauses" which likely would constitute inadmissible hearsay. Robert A. Weems, *Wills & Administration of Estates in Mississippi* § 4:13 (3d ed. 2003).

CONCLUSION

¶21.     We hold that the purported will was not duly executed, as the witnesses had no knowledge that the document they signed was the decedent's last will and testament.  We affirm the lower court's order rejecting the probate of Howard Griffith's purported will.

¶22.     **AFFIRMED.**

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON AND RANDOLPH, JJ., CONCUR. PIERCE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER, J. KITCHENS, J., NOT PARTICIPATING.**

**PIERCE, JUSTICE, DISSENTING:**

¶23.     This Court was emphatically clear when it said:

It is not the policy of the law to permit the defeat of the probate of a will because of the failure of the memory of an attesting witness. The right of a testator to make a will and devise his property as he pleases should not, in the execution of that right and the vesting of the property according to the desire of the testator, be conditioned upon any such fact that might so easily thwart and evade all of the intentions and purposes of the testator in regard to his property, and this, regardless of his thorough compliance in fact with the statutes for the making of wills. In other words, *if the policy of the law were otherwise, it would be quite possible for an heir who had been disinherited to fraudulently procure one of the subscribing witnesses to a will to testify that he had not subscribed the will as an attesting witness and thereby thwart the attempt of the testator to devise his property.* On account of this danger, it is established law that while the testimony of attesting witnesses denying or impeaching the execution of the will is to be considered and may be sufficient in some cases to prevent probate, it is, nevertheless, *to be viewed with caution and suspicion and it is usually entitled to little credence*, and a proponent, obliged to call an attesting witness as a witness, is not bound by his testimony.

12

***Warren v. Sidney's Estate***, 183 Miss. 669, 184 So. 806, 809 (Miss. 1938) (emphasis added).

¶24.    Because of this, and with great respect for my learned colleagues in the majority, I must dissent from today's opinion.  While the majority discusses the supposed lack of knowledge possessed by the two witnesses to the will, it overlooks the constructive publication present in this matter.  I agree that either express or constructive publication of a will to the attesting witnesses is required for valid execution of that will,  and that ***Tyson v. Utterback***, 154 Miss. 381, 122 So. 496, 498-99 (1929), must be overruled where it holds otherwise.  However, I disagree that constructive publication is not present in the matter before us today.  Heeding this Court's warning in ***Warren***, and considering the very inconsistent testimony of the two witnesses to the will at trial, I would find that these witnesses understood that the instrument they witnessed at the People's Bank was Howard Griffith's Last Will and Testament at the time they signed it.

¶25.    This Court has long defined publication as "the act or acts of the party, by which he manifests that it is his intention to give effect to the paper, as his last will and testament." ***Watson v. Lewis Pipes***, 32 Miss. 451, 1856 WL 430, *11 (1856).  Furthermore, we have said, "the formal publication of a will is unnecessary.  A will may be good, under the Statute of Frauds, without any words of the testator declaratory of the nature of the instrument or any formal recognition of it, or allusion to it." ***Id.***  We also have said, "publication and attestation of a will may be by construction.  One may speak by his actions as well as by word of mouth." ***Green v. Pearson***, 145 Miss. 23, 110 So. 862, 864 (1927).  We further explained that "[i]t is sufficient that enough is said and done in the presence and with the knowledge

13

of the testator to make the witnesses understand that he desires them to know that the paper is his will, and that they are to be the witnesses thereto." *Id.* (citing 28 RC.L. p. 127, § 82).

¶26.    In *Maxwell v Lake*, 127 Miss. 107, 88 So. 326, 328 (1921), we said:

> [I]f [the testator] does not sign [the will] in [the witnesses'] presence, there must be *something* to call the witnesses' attention to the fact that it is his will, or that it is his signature, or *something* to show to the witnesses the purpose for which the signing is requested. The court does not require any particular form of words to be used by the testator, but he must indicate *in some way* so as to inform the witnesses as to the purpose of their signing the will.

*Id.* (emphasis added).

¶27.    Turning to the matter at hand, Patrick Bell testified that Howard Griffith was his employer and asked him to "witness something" for him, and he did so at the People's Bank in Magee. When asked how many times he signed, Bell responded, "I'm not sure. . . . Two times, I think." Bell testified that, had he known the document he was signing was a will, he would not have "witnessed it" because "Mr. Howard was sick . . . something was wrong with him, you know, mentally." However, on cross-examination, Bell testified that Howard Griffith seemed to be of sound mind the day he signed his will.

¶28.    When asked why he signed the 2006 affidavit, Bell responded, "I didn't recognize the [will and attached affidavit]. I couldn't be sure that was my signature." On cross-examination, Bell admitted that he did not know who had prepared the 2006 affidavit, but that Howard's son, Jimmy Griffith, gave it to him to sign. He admits that the 2006 affidavit is untrue insofar as it states Bell was told he was witnessing a power of attorney. Bell further admits that the 2006 affidavit was incorrect where it states that his signature on the will was

14

a forgery. He testified that he "didn't recognize any of the documents," but he does recognize that his signature is, in fact, on the documents.

¶29. Eric Scott, when asked how he got from his place of employment to the People's Bank the day the will was signed, replied "I'm really not sure . . . But if my memory serves me well and *so much has gone on.* I think . . . I may have driven my own vehicle there." (Emphasis added.) When asked how many times he signed his signature that day, he responded, "Honestly, I only remember signing in one place . . . but I understand that my signature is on . . . those documents." He then agreed that he might have signed more than once or twice. Scott went on to say, "I don't know what I was witnessing." When asked what state of mind Howard Griffith was in at the bank, Scott responded, "he basically seemed like himself." Scott admitted on cross examination that the 2006 affidavit was invalid. When asked if he remembered signing the affidavit which was made part of the will, Scott said he *did not remember*.

¶30. As discussed in the majority opinion, the signatures of Scott and Bell appear three times on the will and the attached affidavit. Each man's signature is under the word "WITNESSES" to the left of Howard Griffith's signature on his will. Each man's signature is under the "CERTIFICATE," which plainly stated three times that the document they witnessed was the "Last Will and Testament" of Howard Griffith. Finally, each man's signature is affixed to the "AFFIDAVIT OF SUBSCRIBING WITNESSES," wherein both give sworn statements that they are the "subscribing witnesses to a certain instrument of writing purporting to be the Last Will and Testament of Howard Griffith" and that "Howard

15

Griffith was then of sound and disposing mind and memory." The affidavit was signed and sealed by Judy Lofton, a Notary Public. Based on her testimony, both men had to have produced identification in order to sign the affidavit. Furthermore, there are handwritten physical addresses underneath the signatures of both men on the affidavit.

¶31. Based on the less-than-consistent testimony of Bell and Scott at trial, and this Court's strong warning in *Warren* that "testimony of attesting witnesses denying or impeaching the execution of the will . . . [should] be viewed with caution and suspicion and it is usually entitled to little credence," I am of the opinion that the trial court was manifestly in error for holding that the witnesses did not understand that the document they signed was Howard Griffith's Last Will and Testament and the will was not duly executed. *Warren,* 184 So. at 809. The majority opinion clearly lays out the evidence before the trial court: "(1) the will, which included the 'certificate' and 'affidavit of subscribing witnesses'; (2) Scott's and Bell's 2006 affidavits; and (3) Scott's and Bell's testimony at the hearing." (Maj. Op. ¶ 13).

¶32. Both Scott and Bell testified that the 2006 affidavits were incorrect and untruthful. Furthermore, their testimony at the hearing, which is to be viewed with suspicion under *Warren,* revealed that each witness was unclear in his recollection of the events that unfolded the day they witnessed Howard Griffith signing the purported will. Scott testified that "so much [had] gone on" between the time the will was signed and the hearing, and that he did not remember how many times he had signed the will. He also stated that he did not remember signing the AFFIDAVIT OF SUBSCRIBING WITNESSES at all, but admitted it was his signature on that document. Bell testified that he did not recognize the will or the

16

attached affidavit. He did not remember how many times he had signed the will, and although he felt Howard Griffith was sick, he agreed that Howard seemed to be of sound mind the day he signed the will.

¶33. The testimony clearly impeached the 2006 affidavit, and the witnesses' stories are plagued with discrepancies. Furthermore, the testimony of two subscribing witnesses attempting to invalidate the execution of a will is deserving of little credence under **Warren.** The testimony revealed that it was Jimmy Griffith -- who stood to inherit through intestate succession if Howard's will was declared unduly executed -- who presented the witnesses with the grossly inaccurate 2006 affidavits. It is this very type of evidence the **Warren** Court warns us to view with caution and suspicion. **Warren,** 184 So. at 809.

¶34. What is clear from the record, then, is that Scott and Bell signed Howard Griffith's will as witnesses, and signed both a CERTIFICATE and sworn statements in an AFFIDAVIT OF SUBSCRIBING WITNESSES that clearly indicated the document at issue was the Last Will and Testament of Howard Griffith. Bell testified that Howard signed the will in their presence, and this, coupled with the clear and unambiguous language of the CERTIFICATE and AFFIDAVIT OF SUBSCRIBING WITNESSES, constitutes an act "by which [the testator] manifests that it is his intention to give effect to the paper, as his last will and testament" under **Watson,** 32 Miss. 451, 1856 WL 430, \*11 (Miss. 1856).

¶35. While this may not constitute formal publication, this meets the requirements for constructive publication as set out in **Green,** 145 Miss. 23, 110 So. 862, 864 (1927)**,** and **Maxwell**, 127 Miss. 107, 88 So. 326, 328 (1921). Neither witness testified he was prohibited

17

from reading the words on the document. From the record before this Court, it is clear "that enough [was] said and done in the presence and with the knowledge of the testator to make the witnesses understand that he desires them to know that the paper is his will, and that they are to be the witnesses thereto," as set forth in *Green.* The CERTIFICATE and the AFFIDAVIT OF SUBSCRIBING WITNESSES call attention to the fact that the document being witnessed was the Last Will and Testament of Howard Griffith as required for constructive publication by *Maxwell*.

¶36.    Finally, the majority, perhaps unintentionally, has placed every will in this state on the crest of a very slippery slope, one which may fill the chancery courts of this state with witnesses who cannot recall the manner by which countless wills were subscribed and attested. For these reasons, I respectfully dissent. Because I would find that the will was validly executed under these particular facts, I would remand the matter to the trial court for a hearing on undue influence.

**CHANDLER, J., JOINS THIS OPINION.**